**SMITH et al. v. BOLIN et al.**

No. 15440.

Court of Civil Appeals of Texas.

Fort Worth.

Sept. 11, 1953.

Rehearing Denied Oct. 9, 1953.

C. J. Brannan and Nelson, Montgomery, Robertson & Sellers, Wichita Falls, for appellants Dr. P. K. Smith, Dr. J. B. Nail, Dr. O. C. Egdorf, S. G Denny, Kindel Paulk, E A. Denney, Dr. John Arrington and Dr. J. R. Reagan.

Rogers & Eggers, Wichita Falls, for appellant First Nat. Bank of Wichita Falls, independent executor of the estate and testamentary trustee under the will of, Theo W. Beck, deceased.

Kilgore and Kilgore, Dallas, for appellee D. H. Bolin.

Mortimer A. Kline, Los Angeles, Cal., for appellees A. Morgan Maree, Jr., Richard Brooks, Stanley Morner, Cornel Wilde and Patricia K. Wilde.

MASSEY, Chief Justice.

This suit is fundamentally one brought by two groups of plaintiffs, each group in part composed of the personnel of the other, to impose a constructive trust upon oil leases and producing oil wells thereon located, acquired by the primary defendant, D. H. Bolin. Some of the leases in question had been those as to which the members of one of such groups had at a prior time been cotenants along with the primary defendant and upon which they, joined by him, had conducted fruitless drilling operations during the life of the lease estates. Said leases had expired prior to date of the re-acquisition by the primary defendant.

Defendants named along with the primary defendant were individuals and corporations to whom and which the primary defendant had conveyed or mortgaged interests in the leases upon which constructive trusts were sought to be imposed.

The plaintiffs also sued for accounting upon all transactions in connection with all the leases acquired by the primary defendant in 1950 and all the development thereon —upon transactions handled by the primary defendant for them as a trustee in connection with activities during the years 1947, 1948 and 1949 upon and in connection with the leases the members of one of such groups had then been cotenants (and alleged partners) along with the primary defendant,

—and upon all transactions the other of such groups had engaged in as a partnership during the life of which the primary defendant had been managing partner.

Defendants moved for summary judgment. Upon hearing this motion the trial court entered judgment in behalf of the defendants. The plaintiffs appealed.

Judgment affirmed in part and reversed and remanded in part.

█ On date of June 20, 1950, D. H. Bolin, the primary appellee herein, secured by lease from the surface owners mineral interests under two adjacent leases, together comprising what is termed the Howard land leases, and which may also be termed the west Howard lease and the east Howard lease. The lease was for oil and gas minerals. It has been said that such a lease is actually not a lease at all, but is a type of license for purposes of exploration and production. As a license, such creates an incorporeal hereditament. Huston v. Cox, 1918, 103 Kan. 73, 172 P. 992. Though occasion for distinction does not exist as to the questions posed by this appeal, the consciousness thereof is of aid in our analysis.

The land had not been under lease for approximately three months, but prior to date of March 12, 1950, it had been under lease to D. H. Bolin, who held it as trustee for himself and several others who were cotenants thereunder along with him during 1947, 1948, 1949, and in 1950 up to its expiration on March 12. This land was leased by Bolin for himself on March 12, 1947, but subsequently, and during the late spring of 1947, he entered into an agreement with other persons (some of the appellants herein), whereby the leases were owned on the basis of fractional interests. The ownership was in the following persons, as to the stated fractional interest: D. H. Bolin, $9/16$; Dr. P. K. Smith, $2/16$; Dr. J. B. Nail, $1/16$; Dr. O. C. Egdorf, $1/16$; S. G. Denny, $1/16$; Earl Denney, $1/16$; Kindel Paulk, $1/16$; Theo Beck, $1/16$.

Acquisition of these fractional interests was coupled with oral express purpose to drill an oil well or wells, and in July of 1947, the members of the above group drilled an exploratory well at about the center of the west Howard lease. This proved to be a dry hole. It was drilled to a depth of 2,020 feet. At depths of 1,890 feet to 1,930 feet a "crinoidal lime" formation was encountered in which there was "good oil staining". The formation was tested, but failed of production. On or about date of July 18, 1947, the well was plugged and was abandoned. There was no other drilling activity in progress on the Howard land leases at this time, and there was none instituted by any one after that date for a period of approximately a year and a half, when a "farmout well" was drilled on the southern part of the east Howard lease by J. M. Hawley. The well proved dry and was abandoned. The "farmout" was made to Hawley by Bolin under questionable authority, but the act by him was in any event ratified by his cotenants' acceptance of their part of the consideration paid him therefor.

After the acquisition of the fractional interests in ownership in cotenancy in the Howard land leases in 1947, and before the drilling of the well at approximately the center of the west Howard lease, Dr. P. K. Smith had conveyed information in his possession to Bolin and the other members of the group which caused Dr. Smith to believe that the drilling location upon the Howard land leases to be most likely to develop production of oil or gas would be on the northern portion of the west Howard lease. This information so conveyed by Dr. Smith, and upon which he encouraged action, was information acquired by him at a time when he had been a member of a partnership, at least for mining purposes, which drilled wells in that vicinity on the northern portion of the west Howard lease. His "partners" had been John Kay and Gene Clark. Neither John Kay nor Gene Clark was interested in any way in the leasehold estate taken in 1947. The venture of Smith, Kay and Clark was one which took place several years prior to 1947, and the wells in question were drilled to depth of approximately 1,250 feet, proving dry.

The knowledge conveyed to the other cotenants in 1947 by Dr. Smith about the findings from such venture was that such former drilling operations proved that there was oil in the vicinity of the northern part of the west Howard lease but that the well or wells drilled on such prior occasion simply failed to be at proper location to discover it in paying quantities. He suggested drilling at a location near such former wells. Dr. Smith's suggestion as to location was not honored, the well being drilled some distance south, where it proved dry. Bolin selected the location which was drilled. Following this venture, no activity on the west Howard lease taking place in the interim, D. H. Bolin, on date of August 19, 1949, wrote the following letter to all the members in cotenancy with him as to the Howard land leases. The letter read as follows:

"Your attention is called to the two leases which we own in Montague County, Texas, namely, the Edith Paine (the east Howard lease) and Minnie Gault (the west Howard lease), with 320 acres in each lease. These leases by their own terms will expire the early part of 1950. Therefore, we should give consideration to their worth, if any.

"It is my recommendation that we drill two wells, one on each lease to a depth of approximately 1250 feet because there are two known producing sands, one at 850 feet and one at 1250 feet. At this time both Continental Oil Company and Gulf Oil Corporation are drilling many wells in area which have been producing for many years, and are finding wells at particularly 850 feet, and in territory that has been passed up at that depth. In the well that we drilled we set pipe at 850 feet and tested the sand, but it did not make a well. The pipe was then pulled out and we went deeper with the same results. However, at the time, Mr. Miller, my Superintendent, said he believed the production was South and West of our well and in the general area where Continental and Gulf are developing. Frankly, it is quite likely the well will be dry according to the law of averages, but at the same time I am unwilling to surrender the leases without drilling the two wells. Therefore,

please let me know your desires and if any of you want to drop out, I am willing to take your interest and carry on.

"Continental is paying $2.00 per foot and I am sure we can get a well drilled for this price. In addition to the $2.00, there will be approximately $.25 per foot for surface pipe, cement and cementer and testing. In the event of a dry hole, that is about all it would cost. Should we find oil however we will all share our proportionate part of the expense of putting the well on production.

"I would like to get this cleared away the early part of next week.

"Thanking you, I am

"Yours very truly,
"/s/ D. H. Bolin"

Though there was discussion of the subject of Bolin's letter by and between some of the cotenants and between each cotenant with Bolin, nothing immediately developed from the proposal.

In the month of February of 1950 there was undertaken by Bolin and some of the others one further exploratory drilling operation, and which took place on the south line of the east Howard lease. At time of the drilling operation the estate of cotenancy theretofore existing upon both the Howard land leases was changed as to the east Howard lease, so that the fractional interest in the lease thereon was as follows: D. H. Bolin, $11/16$; Dr. J. B. Nail, $1/16$; Dr. O. C. Egdorf, $1/16$; Earl Denney, $1/16$; Kindel Paulk, $1/16$; Theo Beck, $1/16$.

Theo Beck did not agree to pay for any part of the drilling venture on the south line of the east Howard lease, and he never paid any of the expenses. Earl Denney did agree to pay for one-eighth the cost of the drilling. However, after the well proved to be a "dry hole" Denney did not offer to pay such obligation for over two years, or until about the time this suit was filed on June 24, 1952. The well in question was drilled to a depth of 2,765 feet and was abandoned in February of 1950. There was no knowledge obtained from the drilling of this well, or alteration of party relationships

occasioned by such operations, which could be material to the issues of this case. It merely constituted a period during which operation of law and perhaps actual agreement constituted the persons participating in the drilling of that well "mining partners" rather than mere cotenants under the lease drilled.

All parties who were cotenants as to the leasehold estates on both Howard land leases were aware that the leases would expire by their own terms on date of March 12, 1950. Prior to expiration, at least one of the cotenants, Dr. Nail, requested of D. H. Bolin that he re-lease such leases for an additional term, advising Bolin at the time that he would pay for at least his fractional renewable interest as such related to the first leases which were in effect at the time. Bolin's reply to him, however, was that it was impossible to secure a renewal of the leases. It does not appear that Dr. Nail was making his proposal for any one other than himself. Bolin was not under any duty to participate in the acquiring of another lease.

None of the cotenants under the leases from March 12, 1947, to March 12, 1950, took any action toward re-leasing the same premises for oil and gas minerals, either before the leases expired, or afterward—until the date of June 20, 1950, when D. H. Bolin through a lease broker re-acquired the same premises under new leases from the surface owners, to whom title had reverted on March 12, 1950.

Near the date the Howard land leases were to expire on date of March 12, 1950, Bolin obtained certain information from the Standard Oil Company of Texas relating to geology in the area and relating to the Standard Oil Company's disposition respecting its further exploratory drilling in the vicinity. He had, for himself and the others who were cotenants with him as to the leasehold estate in the east Howard lease, obtained a contribution from the Standard Oil Company of Texas to the cost of drilling the well on the south line of the east Howard lease. This oil company had contributed to this cost because of its desire to prove up an adjoining lease, of which it was the owner, and also to add to its geo-logical "over-all" information in the area. The well was in the process of being drilled during the first part of February, 1950, and in some correspondence with the Standard Oil Company, Bolin mentioned the fact that the "crinoidal lime" formation which was found in the course of the drilling of the 1947 well on the west Howard lease was a formation he wished to "define" in the course of the drilling of such well. The formation in question was not encountered during the course of the drilling of this well, however.

At about the same time of the correspondence in question, Bolin was trying to promote the Standard Oil Company in regard to exploratory drilling in the North Texas area to be conducted by him on the basis of Bolin doing the drilling and Standard Oil Company making payment by way of assignment of acreage around the location of such exploratory operations, plus the Standard Oil Company making some contribution to the cost of such operations. In other words, what Bolin was promoting was a type of "farmout" contract whereby he would acquire interests in oil leases on lands in return for his drilling upon such lands at partly his own and partly the Standard Oil Company's expense, with both parties to share in any production realized. This, as applied to this case, is what will be termed a "farmout".

At along about the date of March 12, 1950, the Standard Oil Company of Texas did decide that such exploratory operations as it would thereafter conduct in the area in question would be by way of "farmouts" rather than by way of drilling wholly at its own expense. It selected three locations upon leases owned by it where it was believed drilling operations would be advantageous to it. The first point of advantage was, of course, that which would naturally follow as result of discovery of paying production upon one or more of such operations, and the second point of advantage was the increase of geological knowledge in the area which would be realized even though all of the wells drilled should prove to be "dry holes". Primarily the geological information Bolin obtained related to oil

possibilities in the vicinity of these drilling sites.

The locations selected by Standard Oil Company as the three where they desired to have exploratory drilling operations conducted were in Montague County, Texas, as follows: First, on the Griffith lease, which was located some distance north and west from the Howard land leases; second, on the Gist lease, which lease was adjacent to and immediately north of the west Howard lease; and third on the Cato lease, which was located north and east of the Gist lease, and almost due north of the east Howard lease. The Standard Oil Company desired all these locations to be drilled at about the same time and preferred a "package" deal with whomever they might contract for "farmouts" thereon. They offered to discuss terms with several oil operators, including D. H. Bolin, and as result of discussion over some period of time, did, on or about date of May 6, 1950, enter into a contract with D. H. Bolin to drill exploratory wells on the three locations. The contract called for Bolin to drill first on the Griffith lease, and immediately upon concluding such well by discovery or abandonment to drill secondly on the Gist lease, and immediately upon concluding such well by discovery or abandonment to drill finally on the Cato lease. The consideration to Bolin for doing the drilling so prescribed (which was to be to certain prescribed depths as to each well absent discovery of production at a lesser depth) was the agreement on the part of the Standard Oil Company to convey to him their leasehold interests in 100 acres around each well proven to be productive, from which Standard Oil Company was to receive a prescribed proportion of the production realized. Standard Oil Company agreed, additional to such conveyance of the leasehold estate as to each well from which production might be realized, to pay Bolin a prescribed amount per foot drilled in the exploratory search, as its contribution to the cost of drilling. Such payment was to be made by Standard Oil Company whether or not production was realized.

Prior to May 6, 1950, but subsequent to March 12, 1950, Bolin had a commitment from Standard Oil Company which con-structively bound the Standard Oil Company to make the aforedescribed "farmout" contract. In other words, D. H. Bolin knew he could make the contract with that company. He set about to seek some one to share part of his obligation under such contract, which he intended to enter into. He never at any time acquainted any of the appellants with the proposed enterprise. He located some individuals in the State of California with whom he made a deal to so share a part of his risk. These parties were Richard Brooks, Stanley Morner, Cornel Wilde, Patricia K. Wilde, and A. Morgan Maree, Jr., who are appellees along with Bolin upon this appeal. They entered into a deal with Bolin whereby they took two-thirds of his risk and received right to two-thirds of the profit expectation, upon an agreed cash consideration to Bolin. This was paid in advance of his drilling the three "farmouts" under his contract with the Standard, but placed in escrow with the First National Bank of Wichita Falls, Texas, for delivery to Bolin upon his completion of his contract with Standard Oil Company relative to the drilling of the exploratory wells.

Bolin conducted the exploratory drilling operations upon the Griffith lease to the depth prescribed by contract and abandoned the well so drilled as a "dry hole". Immediately thereafter he instituted exploratory drilling operations upon the Gist lease, and by June 19, 1950, the depth of approximately 1,708 feet was reached, and which depth was to or into the "crinoidal lime" formation. This formation was the same crinoidal lime formation which had been encountered in July of 1947 in the course of the drilling of the well near the center of the west Howard lease, between the depths of 1,890 feet and 1,930 feet. There was difference, however, in that when the formation was drilled into on the Gist lease it became obvious that paying production was realized or realizable from the formation, at least on the Gist lease.

Upon receipt of this information from the well on the Gist lease, on or about June 19, 1950, D. H. Bolin immediately got in touch with a lease broker of Gainesville, Texas, and employed him as his agent to

negotiate for him, Bolin individually, with the owners of the Howard land leases for the purchase of same. This broker did locate and contact such owners and did purchase said leases from the owners thereof, who were the surface owners of the lands in question. The date of the transfer of both leases comprising the Howard land leases was June 20, 1950. The fact that Bolin had a discovery well on the Gist lease was not public at such date, but became so a few days later.

Not long after the discovery became publicized, a meeting was arranged to be held in Wichita Falls, Texas, in the office of D. H. Bolin. The meeting was arranged by Dr. P. K. Smith. The meeting was held on June 26, 1950. At this meeting the following persons were present: D. H. Bolin, Dr. P. K. Smith, Dr. J. B. Nail, Earl Denney, Kindel Paulk, and R. L. Bolin, a son of D. H. Bolin.

It is conceded that at this meeting Dr. Smith was authorized to act and was acting for all other interested appellants.

These appellants were then and there insistent that they were entitled to acquire fractional interests from Bolin in the new leasehold estate on the Howard land leases based upon the cost to Bolin of the new leases on the old lands, the fractional interests to which they claimed entitlement being identical to the fractional interest they had previously owned under the old leases on the same lands when the well of July, 1947 was drilled. Likewise, they were insistent that they were entitled to participate with Bolin in the drilling of additional wells on the north part of the Howard land leases, offsetting the Gist lease, in a search for oil and gas.

Bolin refused the individuals in question the privilege of so sharing in the leasehold estate re-acquired in the Howard lands and likewise refused to consider the participation of said persons in the drilling operations he contemplated upon said lands under the new leases.

Suit was filed on June 24, 1952, by Smith, Nail, Egdorf, Denny, Denney, and Paulk, and they were joined as plaintiffs by the First National Bank of Wichita Falls, Texas, acting as trustee for the estate of Theo Beck, who died May 31, 1950. The suit was filed against D. H. Bolin and others, in part to impress a constructive trust upon the Howard land leases under the purchase of such by D. H. Bolin on June 20, 1950, and for an accounting as to the profits from production realized by him therefrom since date of his acquisition of such leases. The same character of relief was sought as to the "farmouts" acquired from the Standard Oil Company of Texas. Likewise, in amended pleadings, there was sought an accounting of D. H. Bolin for the years 1947, 1948 and 1949, in so far as the interests of the named appellants, as plaintiffs, might appear during those years, under the claim that a proper and correct accounting had not been rendered. Doctors John H. Arrington and J. R. Reagan, whose connection hereafter appears, were joined in the suit, and they adopted the pleadings of the other plaintiffs as their interests appeared thereby.

Motion for summary judgment was filed by D. H. Bolin and his codefendants, and upon a hearing this motion was granted and judgment entered accordingly. From this judgment all the persons in position of plaintiffs have brought this appeal.

In respect to the trusts sought to be impressed, a circumstance which obviously has material effect upon the attitude of appellants Smith, Nail, Egdorf, Earl Denney, Gayle Denny and Kindel Paulk is the fact that in December, 1946, a written partnership agreement was entered into between D. H. Bolin and all of the aforesaid persons except Theo Beck. There were two other persons who were parties to that written partnership agreement of 1946. They were John H. Arrington and J. R. Reagan. The partnership was formed under such contract for purposes prescribed as: "buying, selling, trading, exchanging, developing, equipping, and producing oil, gas, mining leases, real estate, royalties, and all other minerals, and other property and interests therein". Every activity undertaken by this partnership met with utter failure.

360

Original capital of the partnership was prescribed to be $24,000, with D. H. Bolin agreeing to pay $8,000 and each of the others $2,000 each, aggregating $16,000. In other words, of the original capital, Bolin put up one-third and the others two-thirds. It was prescribed, however, that as to additional payments into the partnership after the original capitalization, one-half thereof would be paid by Bolin, and one-half by the eight persons entering into the partnership agreement with him. Properties owned, profits shared, and expenses and losses encountered were provided to be equally divided, fifty per cent to Bolin and fifty per cent to the other eight individuals, each as to one-eighth of such fifty per cent. D. H. Bolin was to take title to all properties as the trustee for the interests of the others, and to transact all the business of such partnership as the managing partner, keeping all the others informed.

At the time such contract was entered into, Bolin already held title to some leases in Comanche County, Oklahoma, and the leases being in "blocks", whereby the production of oil and gas in paying quantities on each block would hold the leases comprising such block without any payment of annual delay rentals on the specific leases comprising the block, and it appears that an obligation was upon him as to each block that he drill a well thereon within a certain period. By memorandum in writing, it appears that each member of the partnership, other than Bolin, agreed with Bolin to a purchase by the partnership from Bolin, as an individual, of the acreage under two of the originally contemplated three blocks of leases at $3 per acre, with agreement further that Bolin was to drill an exploratory well upon each block as an individual contractor acting for the partnership, at actual cost plus 25¢ per foot drilled.

These two of the "blocks" in Comanche County, Oklahoma, were termed the Oldham lease and the Scruggs lease. In the early part of 1947, Bolin did drill exploratory wells on these two blocks, each operation proving up "dry holes". The third "block" was apparently never purchased by the partnership, and there was never any

specific agreement to purchase it. At about the date drilling activity was in progress on the Oldham and the Scruggs leases, however, Bolin either acquired a lease known as the O'Neil lease, or else, if he already owned such lease, he became interested in drilling an exploratory well thereon. In either event, he entered into an agreement with the eight persons with whom he had entered into the aforesaid partnership agreement whereby he conveyed to each a one-eighth interest in the oil and gas lease he had on the O'Neil lease for a consideration of $300 from each person, amounting to a total of $2,400. As part of the consideration, Bolin agreed to drill an exploratory well on such lease at his own costs, the others to have a one-eighth interest each as to any production realized. The drilling of the well on the O'Neil lease proved fruitless and it was abandoned as a "dry hole". Whether or not the purchase of interests in the O'Neil lease, and the drilling operations thereon, should or should not be considered as being within the provisions of the articles of partnership signed by the parties is of no aid to the questions of the case.

By date of May 12, 1947, each member of the partnership with Bolin had expended his $300 for the purchase of the O'Neil lease, and the drilling of the well thereon, though the lease had not expired. Also, the partnership had expended a material part of the capital paid in by the members thereof to that time in acquiring and drilling on the Scruggs and Oldham leases. Some of the members subscribing $2,000 to the capital of the association had paid in all the amount so subscribed, and some of them had not. Those who had not were Dr. Arrington and Dr. Reagan, who had each paid in only $1,000. According to the records being kept by Bolin, each of them owed, as to actual expenditures thertofore made by the partnership, the amount of $307.06. The others, all of whom had fully paid in their subscriptions, each had to his credit in the capital fund $692.94. In July of 1947, Dr. Arrington paid in $307.06 and Dr. Reagan did likewise. They never thereafter paid in any money into the partnership capital, nor participated in any discussion as to any future enterprise.

Though the purposes contracted for under the written contract were quite broad, and the discretion given Bolin thereunder likewise broad, there had actually been no purchase made by the partnership not specifically agreed upon as to amount of acreage and county of its location by each partner, nor no drilling operation upon premises so purchased not specifically agreed upon by each partner. There had been no "selling, trading, exchanging, developing, * * *" etc., as per the other prescribed purposes of the written instrument. Once agreement was made as to acreage to be leased it is clear that Bolin assumed as his right, and the other members acted in such respect as waived any contention to the contrary, control of all details connected with activities. He selected the sites to be drilled, once agreement was reached to share costs, and conducted operations at solely his own discretion in every other respect.

On said date of May 12, 1947, D. H. Bolin wrote a letter to each of the other members of such partnership in which he pointed out that he had secured "about 580 acres in Montague County which is in the close proximity to the North Nocona shallow production". He stated that as of that writing Smith, Nail, Earl Denney and Gayle Denney had agreed to purchase the lease in question and drill two wells thereon. He stated further that the "cost" of a one-eighth interest in the acreage of the lease or leases he mentioned would be approximately $7 per acre interest in that fraction. In other words, each person addressed was informed that for the purchase, from Bolin, of a one-eighth interest in the leasehold estate he owned, it would cost approximately $513. Bolin's letter suggested the purchase be made from him, to be followed by joint expenditures in exploration and development, inferentially but obviously as a project under the written partnership then still existing.

Since the parties mentioned in the letter had already agreed to the suggested purchase and drilling, the subject of the letter primarily concerned Dr. Egdorf, Mr. Paulk, Dr. Arrington and Dr. Reagan. Egdorf and Paulk agreed to the proposition posed by the letter, but Dr. Arrington and Dr. Reagan did not and they either failed or refused to join in the suggested adventure in Montague County, which was that encompassing the purchase of the Howard land leases and the drilling thereon. Dr. P. K. Smith agreed to join in the enterprise on the basis of taking two-eighths interest in the leasehold estate, and a Mr. Theo Beck (not theretofore connected with the others in any wise) agreed to join in the enterprise on the basis of taking one-eighth interest. The charge actually made was on the basis of $6 per acre, and this charge was made on the basis of a group purchase of 580 acres, leasehold estate.

As to this new agreement entered into, all the parties (named heretofore as the ones joining in the enterprise of jointly drilling the first exploratory well on the west Howard lease, near its center, and which parties will be hereinafter termed the "second group" for convenience) contemplated in addition to the drilling in question the acquisition of leasehold interests in the real estate on which the drilling would be conducted. Each person contemplated the purchase of such interest from D. H. Bolin, who already owned the leasehold estate in its entirety and did so make such purchase. There was no writing evidencing the agreement by such parties to bind themselves in any respect, with the sole exception of the following letter written by D. H. Bolin on date of June 23, 1947 to the other individuals joining in the adventure, after they had orally agreed, to wit:

"Dr. P. K. Smith,
"Dr. J. B. Nail,
"Dr. O. C. Egdorf,
"Mr. Earl Denney,
"Mr. Gayle Denney,
"Mr. Kindel Paulk,
"Mr. Theo Beck:

"Gentlmen: This is to advise you that the above named constitute those interested in a certain block of acreage in Montague County, Texas, more particularly described as the Howard land in the Robertson Sur-

vey, and consisting of approximately 580 acres.

"Under our agreement you are the owners of a one-half interest in this leasehold estate, and a well is now drilling located on this property. It is further contemplated that a second well may be drilled on this land. Our agreement heretofore reached is in full force and effect, and I assume you are familiar with it. However, if there is anything you wish to know, please let me hear from you. You are invited to observe the drilling of this well, which should have surface casing set today, and it will be quite interesting by Wednesday of this week.

"You will note there are seven of you interested in this, Dr. Smith having taken two portions and Mr. Theo Beck having taken the remaining one.

"Yours very truly,

"DHB:g D. H. Bolin"

D. H. Bolin, in the conduct of the drilling operations on the west Howard lease, exercised his own judgment as to well location and operations, including their initiation and abandonment, just as he had formerly done under his operations under the partnership. He did as he deemed best, consulting no one and without commitment to the counsel of any one.

While both letters speak of 580 acres, there was a certain part of the leases comprising 60 acres, title to which D. H. Bolin had given the lease-broker who had obtained it for him as payment for the services in obtaining it. The leases Bolin originally acquired totalled 640 acres. This party failed to pay his annual delay rental thereon due March 12, 1948, thus forfeiting it to Bolin. Bolin included it and treated it as having reverted to the members of the second group, and billed them for the delay rental payment to the surface owners on the additional 60 acres on basis of interest therein like unto the original contemplation as to the 580 acres. The leasehold estate owned as cotenants by the second group was thereafter treated by Bolin as constituting 640 acres. In the letter he wrote his cotenants on August 19, 1949 he spoke of the leases in their entirety as "leases which we own". There was never any agreement as to such action by his cotenants in the second group, and it does not appear that they knew they were paying rentals on more than 580 acres when they paid their shares of delay rentals in 1948 and 1949.

At the time the second group was formed, it is to be noted that the first group, those comprising the partnership entered into in writing in December of 1946, still jointly owned leasehold interests in certain leases in Oklahoma. These leases subsequently expired, and with them in our opinion expired the partnership relation to one another of the members of the first group. A great deal of the substance of the briefs of the appellants and appellees is taken up with a discussion of the question as to the character of the partnership composed of the members of the first group, as to whether its character was that of a "mining partnership", as the character of the second group was conceded to be (at least during the period in which it was actually conducting exploratory drilling operations on the west Howard lease), and as to whether there was under a "mining partnership" relationship a transfer or devolution of the interest of certain of the partnership interests as to the first group into Dr. P. K. Smith and Theo Beck, so that the partnership articles entered into by the first group applied by their provisions to the second group and its activities. Also elaborately discussed is the question of when the fiduciary relationship—as of partners, in partnership with one another—or relationships of trust, identical to that existing between partners—ended as between the members of the second group.

It is our conclusion that the questions so posed by the briefs, though highly interesting, would not call for exhaustive analysis as they have little to do with the decision of the ultimate questions controlling the disposition of the case.

 It is our conclusion that the operation of the written contract occasioning partnership relations of the members of

the first group ceased in late 1947 when the jointly owned leases of such group expired, and that such relation as existed between the members thereof constituted individual rights and obligations to such partnership funds as existed thereafter. That though the formation of the association of the members of the second group occurred antecedent to the dissolution of the first group, such constituted a mere overlap incident to periods of time, with no effect upon the diversity of the two relationships. That though the written contract existent as to the first group constituted them partners, operation of law constituted them "mining partners" during the period they actually were jointly engaged in exploratory drilling operations upon the jointly owned leases in Oklahoma, and not at times other than when such operations were in actual progress, in so far as might be applicable the rules of law in cases of "mining partnerships" which prevent dissolution of partnership relations by any alienation of interest of a "mining partner". That the general rules relating to dissolution of partnerships would be applied where the alienation of interest of a partner occurred at any time when all requisites of law did not at that same time exist, constituting activities as those of "mining partners" in a "mining partnership". That for such purposes partners cannot contract with binding authority antecedent to a transfer or devolution of a partner's interest, in absence of joinder by those provided to receive such interest, if operation of law would otherwise fail to preserve the partnership. That the members of the second group were primarily tenants in common under the Howard land leases, except for a period in 1947 when by reason of their jointly engaging in exploratory drilling operations near the center of the west Howard lease they were constituted as a matter of law "mining partners" in a "mining partnership". That upon abandonment of such activity when the well proved dry, their relationship reverted to that of tenants in common. That their trust relationships incident to "mining partnership" ended when the well drilled in 1947 was abandoned, and their trust rela-

tionships incident to "tenancy in common" ended March 12, 1950, when the Howard land leases expired.

The authorities we have found which support the above conclusion are as follows: 32 Tex.Jur., p. 490, sec. 169, p. 494, sec. 173, p. 505, sec. 182, p. 525, sec. 197; Lubbock Grain & Coal Co. v. Ferguson, Tex.Civ. App., Amarillo, 1921, 227 S.W. 539; Fuller v. Laws, 1925, 219 Mo.App. 342, 271 S.W. 836; 32 Tex.Jur., p. 495, sec. 173, p. 220, sec. 3, p. 251, sec. 23; Munsey v. Mills & Garitty, 1926, 115 Tex. 469, 283 S.W. 754; Kahn v. Central Smelting Co., 102 U.S. 641, 26 L.Ed. 266; Root v. Tomberlin, Tex. Civ.App., El Paso, 1931, 36 S.W.2d 596, writ refused; 32 Tex.Jur., p. 246, sec. 20; Wagner Supply Co. v. Bateman, 1929, 118 Tex. 498, 18 S.W.2d 1052; 12 Texas Law Review, p. 414; Thuss, Texas Oil and Gas, Second Edition, p. 215, sec. 160; Summers, Oil & Gas, Permanent Edition, Vol. 4, p. 152, sec. 723, and cases cited under note 20; Gardner v. Wesner, Tex.Civ.App., Austin, 1932, 55 S.W.2d 1104, writ refused; Mountain Iron & Supply Co. v. Branson, 1932, 134 Kan. 818, 8 P.2d 407; Huston v. Cox, 1918, 103 Kan. 73, 172 P. 992; 58 C.J. S., Mines and Minerals, § 245, page 686.

 There are fiduciary relationships growing out of the fact that persons are tenants in common under a lease, held by one of such cotenants for the benefit of all. There are fiduciary relationships growing out of the fact that persons are "mining partners" in a "mining partnership", the activities of which are conducted by one of such "mining partners" for the benefit of the others. There are fiduciary relationships growing out of the fact that persons are partners in an ordinary partnership, the activities of which are conducted by one of such partners as the managing partner. There is a trust relationship in each instance. Such trust relationship, and the trust itself, has a life. It can readily be noted that as to trusts occasioned by relationships of tenancy in common and by relationship of "mining partners", the relationships in themselves are not indicative

of any "reposing of confidence" by each party in the others with whom they are in relationship. Operation of law might constitute such persons "mining partners" as well as cotenants in instances where because of personal enmity or mistrust, the persons would never enter into any kind of partnership agreement with one another voluntarily, yet would be forced to constructively so become "mining partners" because of its necessary incidence to any joint ownership and joint operation of mining properties. The same would be true as to joint operations pursuant to the drilling in a search for oil under leases jointly owned.

■ The general rule is the rule applicable to general or ordinary partnerships, voluntarily entered into and prosecuted by persons with one another, wherein each partner is held to be the confidential agent of the other and wherein each has a right to know all the others know and each is required to make a full disclosure of all material facts within his knowledge relating to the partnership affairs to the others in partnership relation to him. Good faith relationship requires this. This duty of disclosure is absolute. Johnson v. Peckham, 1938, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720.

In the instant case, though the relationship between the members of the second group was that of "mining partners" during the period mining activities, pursuant to drilling operations, were actually in progress—and this by operation of law—yet the facts indisputably disclose that their association together was voluntary and intentional as to each member, with complete trust in good faith reposed in D. H. Bolin by the other members in so far as concerned the mining activities actually performed and in so far as was concerned the period of time entailed in the performance. And the trust of such others having been undoubtedly reposed in Bolin, he would not be permitted any abuse of their confidence which would operate to free him of the right in such others to impose a constructive trust on property or profits acquired by him in breach of the trust. Fitz-Gerald

v. Hull, 1951, 150 Tex. 39, 237 S.W.2d 256. In view thereof a rule of law to be applied to this case, as respects the activities actually performed, will be the same rule as is applied in cases of general or ordinary partnerships, as laid down in the case of Johnson v. Peckham, supra. The activities so performed, constituting what is in law a joint enterprise, any partnership fiduciary relationship existent between the parties ceased as to such a status upon discontinuance of activities occasioning the status, there having been no agreement between the parties which would occasion such degree of fiduciary relationship at any future time. 58 C.J.S., Mines and Minerals, § 251, page 712.

In that case, Johnson v. Peckham, supra [132 Tex. 148, 120 S.W.2d 788], the Supreme Court points out as a reason for such rule, by analogy, that if it were otherwise, one person might "set the stage" for a sharp bargain. The reasoning appears to indicate that such rule must be applied in analogous cases with the principle of law in mind that where there is any evidence which might intimate or tend to show that a fiduciary, even after cessation of the primary fiduciary relationship, *acts in bad faith upon information, property of the association, or acts upon information in bad faith withheld from those who are entitled to have such revealed to them*, then he may be held liable for such act to such persons as occupied relationship to him as his cestuis.

■ In other words, there is necessarily a premise that information acquired as to property or purposes, as to either of which the party so acquiring the information was in fiduciary relationship as a partner with another at the time of its acquisition, such information is "property" belonging to both, the profitable use of or dominion over which by the one shall enure to the benefit of both when wrongfully exercised by the one, or in any case where the non-user does not have an equal right or opportunity to make use of it for his own private benefit. In either event, the acquisition of property as the result thereof would be an

acquisition made in bad faith. Misappropriation by one partner to his own use of the property of the firm is constructive if not actual fraud upon a trust fund. 32 Tex. Jur., p. 298, sec. 50. No party can be permitted to purchase an interest (as to a property) where he has a duty to perform (as to his fiduciary) which is inconsistent with his character as a purchaser. Fitz-Gerald v. Hull, supra, citing 54 Amer.Juris., p. 175, sec. 228.

Indeed, whenever such knowledge is used in such manner as to operate to prevent a fiduciary from accomplishing the purposes occasioning the creation or existence of the fiduciary relation itself, then he is prohibited from so using such knowledge even in the absence of any bad faith on his part. Trice v. Comstock, 8 Cir., 1903, 121 F. 620, 57 C.C.A. 646, 61 L.R.A. 176; Probst v. Hughes, 1930, 143 Okl. 11, 286 P. 875, 69 A.L.R. 929; 26 Ruling Case Law, p. 1247, sec. 93, on Trusts. But in this case, the 1947 leases having expired and the purposes occasioning the joint interests taken therein by the second group having been defeated by such expiration, there being no way the term thereof could have been extended by any unilateral action of the trust organization, or of any member of the trust relationship, as an act to preserve the trust and its purposes, the element of bad faith would be a necessary element to be shown existent as to the re-acquisition by Bolin of such leases.

After the life of the trust, as related to the parties when they were "mining partners", there continued to exist a fiduciary relationship between them by reason of their cotenancy in the leases. The life of the trust, as related to the cotenancy of the members of the second group in the Howard land leases, was limited by the term of the lease. It expired by its own terms on March 12, 1950. D. H. Bolin had the obligation to preserve the life of such leases if they should be considered as the corpus of an active trust. D. H. Bolin did so consider it as an active trust, and preserved the life of the leases as such by the payment of the delay rentals required to be paid on or before March 12, 1948, and on or before March 12, 1949. This requisite to preserve its life existed because there had been no production of oil or gas from either of the leases which would have satisfied conditions of them, eliminating the necessity to pay these delay rentals to so preserve the life of the leases. As has been noted, D. H. Bolin did pay the delay rentals on the basis of 640 acres existent in the two leases, and billed his cotenants proportionally as to such payments on the basis of their ownership, with him, of 640 acreage interest, rather than on the basis of 580 acres. As related to fiduciary relationship existent between Bolin and the other members of the second group, considered solely as existent because of their relation as tenants in common, he was not in trust relation with them once the life of the trust ceased coincidental with the expiration of the leases by their own terms. He did not procure the forfeiture of the leases and life of the trust. He did not, during its life and during the existence of the implied right of the group as cotenants to a renewal of the lease negotiate any renewal for himself. Therefore, he performed his legal duties as to his cotenants, as their trustee, in refraining from any use of the trust to his own personal interest and opportunity for gain by a use adverse to equivalent interest in his cestuis, during the life of the trust. 42 Tex.Jur., p. 710, sec. 95. Knowledge, complaint as to use of which is made by appellants, could not be knowledge acquired on account of trust relationship incident to cotenancy. It must have been acquired on account of activity incident to the relation of the parties as "mining partners". There does exist in respect to the cotenancy relationship a question as to the propriety of the accounting Bolin made to the other members of the second group, but this does not affect the validity of what we have said. This matter of accounting will be discussed later.

By reference to the pleadings, it is observed that the appellant members of the second group have alleged that Bolin acquired knowledge from the operations on the Howard land leases, and/or during the

period when he was in fiduciary relationship with them, which he used to re-acquire that same property and other nearby properties. He is not charged then with a "use of information wrongfully withheld", but is charged with a "use in 'bad faith' of information which was the property of the whole group, for the benefit of himself alone".

The issue then, as to the re-acquisition of the Howard land leases, had it been raised by the evidence, would have embraced inquiry of the trier of the facts of several questions. Firstly, inquiry would be indicated as to whether D. H. Bolin at the time of the cessation of activities pursuant to the drilling operations conducted in 1947 on the well on the west Howard lease had then acquired through said activities or before and during the period of such activities certain knowledge relating to the premises, interpretation and analysis of which by him at the time rendered such knowledge sufficient of itself to cause him to re-lease the premises then under lease to the group. Secondly, assuming that the trier of the facts deemed the knowledge sufficient, inquiry would be indicated as to whether the re-leasing of the Howard lands in 1950 was occasioned because of such knowledge on the part of Bolin and not occasioned in whole or in part because of any information as to such premises that he had obtained independently of any fiduciary relationship or subsequently to the date the well in question was abandoned. Thirdly, assuming that the trier of the facts deemed such knowledge on the part of Bolin to have been the causative factor of the re-acquisition, then inquiry would be properly made as to whether the re-acquisition of the premises under the leases of 1950 was a re-acquisition made in "bad faith" as respected the persons who sought to impress the trust.

■ If the elements requisite to the submission of substantially these questions were not raised by sufficient evidence in the trial court upon the hearing of the summary judgment motion, or if the evidence before the court at such hearing was insufficient to support all the elements of such a finding as against D. H. Bolin, and a judgment against him based thereupon, then as to such phase of this suit the summary judgment was properly entered. Texas Rules of Civil Procedure, rule 166–A; Gulbenkian v. Penn, Tex.Sup.1952, 252 S.W.2d 929.

The knowledge to be inquired about would necessarily be restricted to such knowledge that Bolin obtained as to the Howard land leases on account of any partnership relation as such, or during the time such relationship existed. And could a trier of fact, upon sufficient evidence, find against Bolin in the respects hypothecated, a constructive trust could be impressed upon the re-acquired leases. If a trier of fact could not so find, then a trust could not be impressed.

■ In order for a constructive trust to be impressed upon such leases so re-acquired it would in our opinion be necessary that the knowledge obtained during and because of the partnership relation of trust be sufficient in itself to have occasioned Bolin's act in re-leasing the Howard lands. It must have been, of itself, the causative factor occasioning his act.

All other knowledge which was acquired by D. H. Bolin in his outside activities, removed from relationship as a fiduciary in partnership relation to the other members of the second group and not occasioned thereby, would have been information which was "independently acquired information" or "information which was his own property". Only the information acquired by him in capacity of an agent for the other members of the second group under trust relationship applicable to the circumstances would be property to which they could maintain a claim of ownership.

■ In the oil business, production is constantly being realized under leases previously drilled and apparently proven unproductive. This often occurs by reason of the fact that the formerly drilled wells did not go deep enough to reach the oil. It also occurs because of the fact that through the use of explosives and acids, etc., formations

previously deemed unproductive have been treated in such manner as to result in their actual productivity. There are many theories presently in the minds of men which in some instances will one day prove to constitute fact. Knowledge as to facts in one man as to formations under a certain oil and gas lease may be worthless in light of his interpretation thereof, while the same knowledge in another man might be worth millions of dollars. The difference would be in the interpretation of the facts. And a man who yesterday could not have interpreted the facts might have, in a period of hours, acquired the knowledge which enabled him to make a new interpretation thereof so that today he realizes as having enormous value that which yesterday he deemed worthless. The fact, then, that an oil man will go back to a fee owner and re-lease for oil and gas purposes the same premises which he allowed to lapse a week ago does not necessarily mean that the man had knowledge the week before which should have occasioned his strenuous efforts to prevent the lapse. It may well mean that the man at time of the re-acquisition had knowledge, and a consciousness of the interpretation thereof, which he did not have at time of the lapse. For this reason, we believe, that in cases where there is sought to be imposed a constructive trust on a lease taken by one man, claimed in part because of the fact that the same lease was formerly held by him in trust for others, it must be affirmatively shown that such a man acted in the re-acquisition of the lease solely upon knowledge that was the property of his trust, which knowledge was sufficient unto itself at the time of the expiration of the trust to have occasioned the act.

In arriving at this to be the rule applicable to the question we are not unmindful of the very reason cited by the court in the case of Kahn v. Central Smelting Co., 102 U.S. 641, 26 L.Ed. 266, cited in Munsey v. Mills & Garitty, 1926, 115 Tex. 469, 283 S.W. 754, 760, as underlying the reason for holding that mining partnerships are not dissolved by the death or withdrawal of a partner thereto—being that without appli-cation of such as a rule of law—" 'successful mining would be attended with difficulties and embarrassments, much greater than at present.' " Men in the oil business constantly acquire new knowledge and change their conclusions as to old information, all contributing to occasion their entry upon new ventures. This is "life blood" to the oil business. It would be an undue burden to impose the duty upon such a man to look back upon his past experiences to determine whether some other person contributed in part to his knowledge, the whole of which led him to believe he might profitably explore for oil in a certain place, and to abstain from the venture if he be unwilling to undertake it because of the legal ability in such other person to impress a trust upon what he might find, in the event he found anything, merely because of his having a claim upon a part of his knowledge, in itself insufficient to have occasioned any action whatsoever.

We might note the fact that in part the reason that Dr. P. K. Smith joined the second group, taking a $\frac{3}{16}$th interest in the Howard land leases, was because of knowledge he had gained as a fiduciary with John Kay and Gene Clark when they drilled the wells on the west Howard lease in prior years. The question is then posed as to whether Kay and Clark might have sought to impress a trust upon a part of Dr. Smith's $\frac{3}{16}$th, had the well drilled in 1947 proven productive.

Additional to, but taken into consideration with the question as to whether the knowledge upon which Bolin acted was the property of the second group, is the element of "bad faith" as to his act of re-acquisition.

Many years ago, when mining ventures consisted primarily in grubbing in the earth in search of metallic ores, there were occasions when mining properties were discovered by individuals who were "grubstaked" by other persons. Those who were "grubstaked" in many instances agreed to share any profits in some specified proportion of the ventures "grubstaked" in the event they proved successful. There were

instances when valuable properties were actually found, locations made and claims filed of record, enuring to the benefit of the finder and those who had "grubstaked" him. In some of these instances, and as to instances of similarity, the finder (perhaps unbeknownst to his fiduciary) allowed the claims to lapse through non-development or otherwise under some law which occasioned a forfeiture of the premises back to the original owner (usually the Federal Government), and then, after the fiduciary relationship had ended, the finder would go back on the same premises and make a new location, or a re-location, at the same place, followed by the filing and recording of a new claim to his own benefit alone. Of course, litigation sometimes ensued over claims of former cestuis that constructive trusts should be impressed upon the new claims. In those cases the courts applied the test of "good faith" to the re-location, holding that no constructive trust would be impressed if it was a "re-location" made in "good faith". 58 C.J.S., Mines and Minerals, § 86, page 147, and cases cited thereunder.

"Good faith", as applied to these ancient matters, and as well applied to the question posed by the instant case, might well be tested by inquiry as to whether the act of the re-acquirer in acquiring the new location or lease was done or performed honestly as respected the persons who had formerly been in fiduciary relation with him as his cestuis; without intent of any fraud or deceit having been in existence in him toward them at the time of his act; really and actually free from any intent to profit from information properly belonging to them, rather than mere pretense that there was an absence of such an intent. See 18 Words and Phrases, Good Faith; Peden Iron & Steel Co. v. Jenkins, Tex.Civ.App., Beaumont, 1918, 203 S.W. 180, writ refused. Further, that it was an act done free from any intent to take any conscious advantage of the others in such relation to him (even through the forms and technicalities of law), together with an absence of all information or benefit of facts, knowledge and consciousness of which would render the act unconscientious. 1 Bouvier's Law Dictionary, Rawle's Third Revision, p. 1359. But in the antithesis, that the re-acquirer acted in "bad faith", which contemplates that his state of mind affirmatively operated with a furtive design or with some motive of self-interest or ill will, or for an ulterior purpose in the gaining of a profit resulting from a corresponding loss to such others. And as regards the particular circumstances of such cases, his act would be no different from fraud on his part, as proceeding or acting dishonestly, intentionally, and deliberately, with a wicked motive, to cheat or deceive those constituting his cestuis in respect to the acquisition of the lease or location to their damage or loss, and to his own advantage or gain. Warfield Natural Gas Co. v. Allen, 1933, 248 Ky. 646, 59 S.W.2d 534, 91 A.L.R. 890.

It may readily be observed that the tests of "good faith" or "bad faith" resulted in proper solutions in those cases where mineral ores were the subject of mining, and the same would be true as to the oil and gas industry in an instance when a person actually knew or had good reason to know that there were oil and gas minerals under a certain lease at a time within the time of partnership fiduciary relationship. However, there is a certain difference which we must observe in the case of oil and gas leases where this is not necessarily the circumstance, as where there is no evidence of the existence of such knowledge.

As authority persuasive of their position in this case the appellants have cited the case of Ballard v. Claude Drilling Co., 1939, 149 Kan. 506, 88 P.2d 1021, which is a case where knowledge upon which one party sought to act was prevented of use by the other by a purposely withheld cooperation so as to enable the action upon the knowledge by such other at a subsequent time and to the exclusion of the one first seeking to act. The knowledge in that case was received by the ultimate actor from the other party under circumstances which constituted the parties fiduciaries as to such. All the elements of a correct rule of law, at which we seek to arrive, would apply to the case cited.

■ Accepting as true all the evidence of appellants tending to support their contentions on the point, was any issue raised by sufficient evidence to warrant a decision in their behalf on the fact? McDonald, Texas Civil Practice, Vol. 4, p. 1394, sec. 17.26. We must so accept such evidence, though we may also consider that part of the testimony of D. H. Bolin in respects where such is not contradicted by any other witness, or attendant circumstances, provided such is clear, direct and positive, free from contradictions, inaccuracies, and circumstances tending to cast suspicion thereon, which we are to take as true as a matter of law. Cochran v. Wool Growers Central Storage Co., 1942, 140 Tex. 184, 166 S.W.2d 904; Fowler v. Texas Employers' Insurance Association, Tex.Civ. App., Fort Worth, 1951, 237 S.W.2d 373, writ refused.

■ The burden of proof upon the issue, including the question as to the "bad faith" on the part of D. H. Bolin, or as to the absence of his "good faith", naturally falls incumbent upon the appellants who were members of the second group along with him, who raised the issue. We revert to a consideration of the evidence, for the purpose of determining whether these parties, as plaintiffs in the court below, carried the heavy burden they had to assume of proving that D. H. Bolin acted in bad faith or fraudulently in the reacquisition of the leases on the Howard lands, and on account of knowledge which was properly the property of such parties.

An examination of the record reveals that these appellants, as plaintiffs in the trial court, never offered any evidence raising an inference that would justify a conclusion that the information which was the property of the second group as a whole was either sufficient unto itself to cause Bolin to re-lease the Howard lands, or was the causative factor occasioning the releasing of the Howard lands. The evidence conclusively demonstrates that D. H. Bolin acted to re-lease such lands, at least in part, because of knowledge he acquired independently and apart from the relationship which had once obtained, in particularity the knowledge that he did have, or would have a producing oil well on the Gist lease. There is no evidence raising any inference that as to the re-acquisition of the Howard land leases Bolin acted with any dishonest motive of deliberately and intentionally excluding from the venture his former associates to his profit and their damage or loss.

■ We therefore conclude that D. H. Bolin properly re-acquired, for himself, the leasehold estate under the Howard land leases under the instruments of June 20, 1950.

■ In addition to the efforts of the appellants in this case to impress a trust upon D. H. Bolin's re-acquisition of the Howard land leases, they also seek to impress a trust upon the "farmouts" obtained by him from the Standard Oil Company of Texas. The same rules relating to use of information or knowledge, property of the second group, in the re-acquisition of the Howard land leases might be applied to the "farmout leases". Application of these rules would defeat the claims of the appellants as to these leases, for likewise there is no evidence which even inferentially establishes that D. H. Bolin acted in bad faith in undertaking the ventures which resulted in his acquiring them. The same is true upon the question of whether the information occasioning his act was partnership property. However, there is additional legal basis for this defeat. The venture engaged in by the members of the second group was specific as to the property upon which they conducted same, being upon their jointly held leasehold estates in the Howard lands. All parties knew and understood that D. H. Bolin engaged in transactions of like character with other parties and also as an individual at other places. He was in the oil business generally and dealt in leases and in operations on leases in many places. Likewise, at least certain other members of the second group engaged in oil activities outside those the second group engaged in together. Even though they were in fiduciary relationship,

one to another, as to the Howard land leases during the period they owned them, these leases were the corpus of their trust and impliedly though not expressly the scope of their enterprise was narrowed to such or to operations thereon. It was the only premises on and in relation to which all of them or any of them could have acted in respect to privilege or duty pursuant to the purposes of their association. The rules of equity applicable to them in relation to such premises and to ventures there prosecuted will not be extended so as to forbid the acquisition, ownership or development by one of the parties for his own benefit of property not embraced in the enterprise and outside its scope. Warner v. Winn, 1946, 145 Tex. 302, 197 S.W.2d 338, and cases there cited; 58 C.J.S., Mines and Minerals, § 251, page 712. The fiduciary duties they owed one another would be no broader than the activities encompassed by their agreements relating thereto.

■ None of the appellants having had any interest in the "farmouts" either before or at the time Bolin made the contract, performance of the obligations of which resulted in his acquiring them, Bolin owed them no duty to "look out for any assertable interest they might make thereto", and such appellants have not met the requirements relating thereto necessary in such cases. Collins v. Collins, Tex.Civ.App. Fort Worth, 1941, 154 S.W.2d 210, writ refused, w. o. m., and cases cited therein.

■ Our consideration is now directed to the prayer for an accounting which is part and parcel of the action brought by the appellants. We view the evidence on this issue as required by the nature of summary judgments, and with identical tests applied as to the part of the case concerning constructive trusts.

As to the re-acquisition of the Howard land leases and as to the "farmout" leases, our conclusion that the appellants can maintain no interest therein, coupled with the fact of their having never made any financial investment relating thereto, there is no occasion for consideration of these matters. By reference to the pleadings it is observed that the accounting sought does not embrace the enterprise in 1950 when only part of the members of the second group drilled a "dry hole" on the south line of the east Howard lease, so we need not consider this.

Remaining is the question as to accounting on the following: First, the delay rental payments on the Howard land leases due and paid on or before March 12, 1949; second, the delay rental payments on the same leases due and paid on or before March 12, 1948; third, the expenditures in the course of the drilling of the well in 1947 near the center of the west Howard lease, coupled with the acquisition of both the Howard leases; and fourth, the partnership accounting under the written articles entered into in December of 1946. The appellee D. H. Bolin has plead as defense to this the four-year statute of limitation, on the premise that the scope of the ventures in question, etc., are evidenced by instruments in writing. Appellants allege fraud or mutual mistake. It is noted that in their petition originally filed appellants made no allegations whatever in connection with the accountings, and it seems to have been charged as an issue in amended pleadings as result of certain facts which came to light during the taking of the deposition of D. H. Bolin.

The evidence shows that the original leasehold interest acquired by the members of the second group from D. H. Bolin was 580 acres. D. H. Bolin had originally leased 640 acres, transferring 60 acres thereof to the lease broker who negotiated the lease purchase, and which resulted in Bolin having only 580 acres at the time the second group was formed. The fact that 580 acres was the total acreage involved when the group was formed is evidenced by the letter of June 23, 1947, written by Bolin to each of the other members. When the delay rentals due March 12, 1948, fell due, the lease broker failed to pay same as to his 60 acres, and forfeited his right to this acreage to Bolin, who paid the delay rental due thereon as well as the

delay rentals due on the other 580 acres. Bolin then, without any agreement made by any of the other members of the second group, charged them for the proportion of the delay rentals paid in 1948 on this 60 acres on the same basis as he charged them as to the 580 acres they originally contracted to take a proportionate interest in. He did the same in 1949.

Bolin testified that the specific 60 acres in question was in the east Howard lease, and a written instrument was held in his files which supported this fact and the further fact that the lease broker failed to pay his part of the rentals thereon and forfeited his rights back to Bolin. Bolin's own pencil notation at the bottom of the instrument reads: "Anderson did not pay his rental, we have the Lease now. B." However, Bolin's credibility would be in issue as to where the 60 acres in question was, whether it was forfeited, and even so, whether he took it for the benefit of himself alone or for all the members of the second group, and additionally if he did so there would be some question as to whether the treatment of it thereafter as it was treated was in fact ratified by the other members. It is undisputed that Bolin did charge the second group with the delay rentals on the 60 acres, and that they never affirmatively made any agreements with reference thereto. A fact issue therefore exists in the case in this respect for consideration and decision by a trier of fact. Limitation will not apply. Appellants discovered the facts and circumstances during the course of taking depositions after the suit was filed. The issue is material, even though the amount to be resolved by its settlement is negligible and would support the maintenance of a suit.

No testimony was developed upon the summary judgment hearing which raised any triable issue on the validity of the accounting made to the second group on the expense of acquisition of the Howard land leases in 1947 and on the expense of the drilling of the well in 1947. The members of the second group, other than Bolin, agreed with him on the price to the group of the purchase of the interest in the 580 acres he already owned in its entirety, and what it had originally cost him would not be a subject of inquiry. This would have been a matter for "arms-length" dealing. An accounting was made by Bolin to the others on the expense of the venture, and nothing in the evidence before the court raised an issue as to there having been any misrepresentation therein. Bolin testified that it was a correct accounting and nothing to indicate the contrary appears. It will be taken as correct.

As to the partnership accounting under the partnership articles of December, 1946, and in particular as applied to the properties known as the Scruggs Block and Oldham Block, it is noted that by agreement the partnership acquired them from D. H. Bolin as an individual on the basis of $3 per acre to the partnership, and that the acreage so to be acquired under the Scruggs was in the aggregate of 1,240 acres, and under the Oldham was in the aggregate of 960 acres. The evidence before the court upon the hearing of the summary judgment left unsettled, but raised thereby, issues as to just what particular properties were acquired by Bolin for the partnership, how many acres were embraced by such properties, and whether less than the above aggregate acres as to each block agreed to be paid for by the partners, and paid for by all of them who were in partnership with Bolin, were actually acquired. In other words, left in doubt, at least, is a question as to whether they ever got what they paid for, and whether they paid more than $3 per acre for what they got.

Under the peculiar relationship of the partnership, all other members reposed confidence in D. H. Bolin in respect to application of partnership funds toward acquisition of properties, once they agreed to acquire properties denoted as to description primarily by the fact that they were located in Comanche County, Oklahoma. They left strictly up to Bolin the actual premises leased, and they trusted in him to see that such premises embraced the acreage agreed upon.

The development of the facts raising the issues in this respect occurred during the course of the taking of the deposition of D. H. Bolin, and became known to the appellants who had been in partnership with Bolin under the articles of agreement of December, 1946, when the deposition was taken. The statutes of limitation would not apply.

Judgment of the trial court is affirmed except as to the accounting upon the delay rental payments due and paid on the Howard land leases in 1948 and 1949, and as to the accounting as to the dissolution of partnership of December, 1946. Judgment of the trial court is reversed and the cause remanded for a trial of the issues upon these accountings.

BOYD, J., concurring in part and dissenting in part.

BOYD, Justice.

I concur in the opinion of the Court in so far as it in part reverses the judgment and remands the cause; but I am forced to the conclusion that issues were raised by the evidence as to whether appellants are entitled to impress a constructive trust on the properties of appellee Bolin, and therefore respectfully dissent from the affirmance of the summary judgment in favor of Bolin on that phase of the case.

Although there may not be material dispute as to any *transaction,* and, in that sense, any *fact,* when an inference is to be drawn therefrom it is itself a fact; and if witnesses agree, reasonable minds may differ as to what ultimate issue the facts establish. Inferences to be drawn from circumstances are not testified to by witnesses, and therefore cannot be said to have been established by the evidence, though uncontradicted, unless the facts will admit of but one conclusion.

A jury might conclude that Bolin violated a trust in acquiring for his own account the gist and Crownover farmouts and the new Howard leases. It might conclude that in acquiring them he was motivated by information that came to him while in confidential relationship to appellants, and was partnership property.

When asked by Dr. Smith to obtain farmouts on the Gist and Crownover leases, Bolin said he was not interested, and in his brief argues that it could not then be done; but on May 6, 1950, he was interested and did it. In January or February, 1950, when asked by Dr. Nail to secure new leases on the Howard land, Bolin replied that "We could no more get that than we could get wings and fly to Heaven this afternoon." Neither Dr. Nail nor Mr. Bolin has taken wings and flown to Heaven, but on June 20, 1950, Bolin got new Howard leases.

It is possible that after Bolin drilled two wells on the Howard leases he knew more about the subsurface structure than he did theretofore. Dr. Smith, who in 1938 had been interested in some drilling ventures on the Howard land, and who was familiar with John Kay's geological data on the area, told Bolin all he knew about the geological picture, and gave him the benefit of Kay's data. Oliver, Standard's division exploration superintendent, testified that on March 9 or 10, 1950, he discussed with Bolin a proposed farmout of the Gist, the Crownover, and other leases in the vicinity of the Howard land; and that on the same occasion he showed Bolin Standard's geology in the area, and that in the same conference Standard agreed to give 100 acres per well instead of 40 acres as originally proposed. Although Bolin may be the only person who knows what information motivated him in acquiring the Gist and Crownover farmouts and the new Howard leases, his testimony on the point is not conclusive, but only tenders an issue of fact.