641 F.2d 1146
 Oscar C. PALMER, Sr., Trustee, Oscar Palmer, Revocable
Trust, and Corinne Palmer, Revocable Trust,
Plaintiff-Appellee,
v.
J. B. FUQUA, J. Rex Fuqua and Hytech Energy Corporation,
Defendants-Appellants.
 No. 79-2807.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 April 8, 1981.
 Ronald D. Krist, Stanley J. Krist, Scott Douglas Cunningham, Houston, Tex., for defendants-appellants.
 James V. Hammett, Jr., Austin, Tex., for Hytech Energy Corp.
 Groce, Locke & Hebdon, John R. Locke, Jr., San Antonio, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Texas.
 Before WISDOM, POLITZ and SAM D. JOHNSON, Circuit Judges.
 SAM D. JOHNSON, Circuit Judge:
 
 
 1
 In this Texas diversity action, plaintiff Oscar C. Palmer, Sr., a limited partner in a partnership known as Atlanta Limited No. 2, successfully sought to impose a constructive trust on an undivided one-sixth interest in an oil and gas lease, hereinafter referred to as the Ritchie lease. The district court held that by failing to offer Palmer the opportunity to participate in the acquisition and development of the Ritchie lease, defendant J. B. Fuqua, the sole general partner in the partnership, had breached the Limited Partnership Agreement of Atlanta Limited No. 2 and had violated his fiduciary obligation. Inasmuch as the trial court committed no reversible error, we affirm.
 
 
 2
 This suit is based upon a written limited partnership agreement entered into by Palmer, a limited partner, J. Rex Fuqua, a limited partner, and J. B. Fuqua, the general partner.[1] Article 1.02 of the partnership agreement provides that the purpose of the partnership was to:
 
 
 3
 Acquire, by purchase or otherwise, oil and gas leases and oil and gas mineral properties and interests therein, to explore such leases and properties for the production of oil and gas by whatever methods, to complete test wells and to make arrangements for the development and operation of such oil and gas properties in such areas as may be selected at the discretion of the General Partner.
 
 
 4
 This case involves a dispute over the interpretation of the phrase "area of interest owned" contained in Article 10.06 of the Limited Partnership Agreement of Atlanta Limited No. 2. Article 10.06 states:All of the Partners reserve the right to acquire oil and gas properties and conduct oil and gas exploration and development activities for their own accounts or for others, including other oil and gas ventures, programs and partnerships during the term of this Partnership. However, any property or properties acquired in the area of interest owned by this Partnership shall be offered first to the Limited Partners in this Partnership who will have twenty (20) days in which to accept or refuse participation in the acquisition of such property or properties.
 
 I. Facts
 
 5
 This partnership was originally initiated by Charles S. Beck, an oil and gas promoter in San Antonio, Texas, who deals individually and as Capitol Resources, Inc., a company controlled and managed by Beck. Prior to the formation of Atlanta Limited No. 2, Beck and the Fuquas participated in two other oil and gas ventures promoted by Beck.[2] Early in 1976, Beck contacted a group of potential investors, including Palmer and the Fuquas, with respect to certain oil and gas leases he wished to acquire. By letter dated April 22, 1976, Palmer and Capitol Resources, Inc. entered into an agreement to develop certain oil and gas leases in Wilson County, Texas. Although no mention of the Fuquas was made in this letter of agreement, there was testimony at trial indicating that Beck informed Palmer that the Fuquas would also join in this venture.[3] Palmer and Beck subsequently entered into an addendum[4] to the letter of agreement that was executed in order to:
 
 
 6
 evince the intention of the parties to enter into a Limited Partnership Agreement which shall provide for the participation by Palmer, as a limited partner, in the development and production of oil and gas leases (and oil wells being or to be drilled thereon) identified in Schedule 1 attached hereto ("Leases").
 
 
 7
 Schedule 1 described various oil and gas leases, one of which was the Beever Brothers lease,[5] to be drilled in Dimmitt, Frio, LaSalle, Wilson, and Caldwell Counties.[6] The addendum provided that Palmer would bear one-sixth of the costs and expenses of development, with J. B. Fuqua (one-third), J. Rex Fuqua (one-third), and Beck (onesixth), sharing the balance. It also provided that the Fuquas and Palmer would be limited partners and that Beck would be the general partner. The addendum was not signed by the Fuquas.[7]
 
 
 8
 Early in June of 1976, a lease broker submitted to Beck and Capitol Resources a group of five leases covering 950 acres, referred to as the $135,000 package of leases. One of the leases was the Ritchie lease.[8] On June 11, 1976, Beck offered these to Palmer. There is conflicting testimony as to Palmer's response. Defendants contend that Palmer refused these leases and that Beck subsequently contacted the Fuquas about the package of leases. J. B. Fuqua accepted and forwarded the funds ($135,000), with explicit instructions that these leases were to be acquired for Fuqua alone. Of the original five leases proposed, only three were actually acquired. The Ritchie lease was not acquired at that time, apparently due to the owner's refusal to deal with Beck. Palmer, on the other hand, contends that he believed the $135,000 package of leases was to be acquired for the partnership, that he offered to buy the leases in his own name until the partnership was formalized, but that Beck's son (and later Beck himself) refused his offer.[9]
 
 
 9
 Shortly afterward, the Fuquas discovered that much of the money they had advanced to Beck had disappeared. Moreover, Atlanta Limited No. 2 had not been qualified as a limited partnership, thus exposing the Fuquas and Palmer to liability for debts incurred by Beck. Beck's management of the oil and gas properties was terminated by the Fuquas in July 1976, and Hytech Energy Corporation was employed to manage the properties. In addition, Beck, J. B., and J. Rex Fuqua entered into a settlement agreement providing that: (1) Atlanta Limited No. 1 would be dissolved and all assets thereof would be conveyed to the Fuquas, (2) the Fuquas would assume all liabilities in connection with Atlanta Limited No. 1, (3) Beck would resign as general partner of Atlanta Limited No. 2 and would transfer his interest therein to the Fuquas and Palmer, (4) the partnership would assume all of Beck's liabilities incurred in connection with Atlanta Limited No. 2, and (5) the parties would cancel and release all claims against each other arising out of any prior business relationship between them.
 
 
 10
 On July 7, 1976, Palmer met with Beck and several others in San Antonio in an attempt to settle the confusion surrounding the financial and administrative affairs of the anticipated partnership. The Fuquas were not present at this meeting. Defendants contend that at this meeting Palmer was informed that the $135,000 package of leases was being acquired by Fuqua for his individual interest. The next day, July 8, 1976, J. B. Fuqua met with Palmer in Atlanta. Fuqua alleges that at that time he reminded Palmer that the package of leases was being acquired by J. B. Fuqua individually and not for the partnership. Palmer states that he told the Fuquas at that time that he understood the leases were being acquired for the partnership. Both of these meetings were recorded by Palmer and the tapes of the meetings were introduced at trial.[10]
 
 
 11
 Beck, Palmer, and the Fuquas entered into an amendment to the partnership agreement, which was dated July 8, 1976, whereby Beck was replaced as general partner by J. B. Fuqua. This agreement was signed by the Fuquas on July 8, 1976, and by Palmer on July 13, 1976. On July 14, 1976, J. B. Fuqua filed the certificate of limited partnership with the Secretary of State. Pursuant to the settlement agreement between the Fuquas and Beck, Beck caused all of the Atlanta Limited No. 2 leases held by him and Capitol Resources to be assigned to Atlanta Limited No. 2. On August 20, 1976, the Beever Brothers lease was assigned to J. B. Fuqua. On the same day, Fuqua assigned the lease to Atlanta Limited No. 2. To date, three wells have been drilled on the Beever Brothers property, and this lease has proved to be the most profitable asset owned by the partnership.
 
 
 12
 On October 22, 1976, the Ritchie lease was finally acquired by J. B. Fuqua. Upon acquisition of the lease, J. B. Fuqua assigned an undivided one-third interest therein to J. Rex Fuqua. The Ritchie lease covers approximately 315 acres of land, and is divided into four separate, fragmented, and noncontiguous tracts.[11] The Fuquas individually drilled three wells on the Ritchie lease between November of 1976 and April of 1977.[12]
 
 
 13
 Between January and September of 1977, the parties engaged in protracted correspondence. Palmer wrote to Hytech on February 16, 1977, asking to be "informed as to any present or proposed drill operations contiguous or adjacent to Atlanta No. 2 properties." That letter touched off inquiries within Hytech resulting in the so-called "Lacy letters," in which Jim Lacy, the President of Hytech, volunteered the opinion that at least one portion of the Ritchie lease would be within the area of interest owned by the partnership. These letters were introduced at trial solely for the purpose of showing bad faith on the part of the defendants. Palmer finally demanded that Fuqua transfer to him a one-sixth interest in the Ritchie lease in exchange for the payment by him of one-sixth of the cost of acquisition, development, and operation. The Fuquas refused unless Palmer would participate in the drilling program for the entire $135,000 block of leases, which Palmer refused to do. This litigation resulted.
 
 
 14
 Palmer, as trustee for the Oscar and Corinne Palmer Revocable Trust, originally filed suit on January 30, 1978, alleging that the Fuquas' refusal to offer Palmer the opportunity to participate in the Ritchie lease and their refusal to assign an interest therein to Palmer was a breach of their fiduciary duty to plaintiff as a partner and, more specifically, a breach of the limited partnership agreement. Plaintiff prayed for the imposition of a constructive trust, the transfer of title to an undivided one-sixth interest in the Ritchie lease to plaintiff, an interest in the proceeds of sale of all oil and gas that had been produced and sold from the property, exemplary damages, and attorney's fees. Defendants claimed that plaintiff's action was barred by the Statute of Frauds, the Texas Statute of Conveyances, and the Texas Trust Act. In addition, defendants raised a counterclaim alleging that Palmer had failed to pay the sums required by the partnership agreement as his contributive share or capital contribution to the partnership.[13] By an amended answer filed January 26, 1979, defendants also asserted that plaintiff's claim was barred by waiver, laches, estoppel, and the "stale claim doctrine."
 
 
 15
 The case came to trial before the court and a jury on June 15, 1979. By a directed verdict in favor of Palmer, the district court held that the Ritchie lease fell within the area of interest owned by the partnership and that J. B. Fuqua had breached his fiduciary duty to Palmer. The court imposed a constructive trust on an undivided one-sixth interest in the Ritchie lease. In addition, the court ordered that:
 
 
 16
 an accounting shall be had of Defendants' records by the firm of ERNST & ERNST in order to determine all costs of acquisition, development and operation of such Ritchie lease from inception to the effective date of the assignment to Plaintiff of his interest therein, as well as the total amount of the proceeds accruing to ownership of the leasehold estate from the same period of time so as to determine the amount owing to Plaintiff for oil and gas heretofore produced from such lease.
 
 
 17
 The judge dismissed the Fuquas' counterclaim, and refused to instruct the jury on the Fuquas' affirmative defenses. The only issue submitted to the jury was whether exemplary damages should be assessed against the defendant J. B. Fuqua. The jury assessed J. B. Fuqua with exemplary damages, which included an assessment of attorney's fees, totaling $195,000.
 
 
 18
 In reviewing the propriety of the district court's action in granting a directed verdict in favor of Palmer on the issues of the interpretation of the term "area of interest owned," the existence and breach of a fiduciary duty, and the defendants' affirmative defenses, this Court is governed by the standard enunciated in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc). In that case this Court stated:
 
 
 19
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence not just that evidence which supports the non-mover's case but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 20
 Id. at 374-75 (footnote omitted).
 
 
 21
 II. "Area of Interest Owned" By the Partnership
 
 
 22
 A number of the issues on appeal in this case turn on the interpretation of the contractual language "area of interest owned" by the partnership. Both at trial and on appeal, plaintiff and defendants agree that the phrase is not ambiguous and that its construction was a matter of law for the court.[14]
 
 
 23
 The district court held that the Ritchie lease was within the area of interest owned by the partnership. The judge apparently concluded that the property was within the area of interest owned by the partnership because at least a portion of the Ritchie lease was adjacent to the Beever Brothers property. The trial judge stated that:
 
 
 24
 When Mr. Fuqua, during the existence of the relationship, acquired the Ritchie Lease, a lease which covered among others lands contiguous to property owned by the partnership, Mr. Fuqua had a duty either to acquire the lease on behalf of the partnership, Atlanta Limited Number 2, or to offer Mr. Palmer the opportunity to participate in its acquisition. (emphasis added).
 
 
 25
 This Court need not decide whether the interpretation of the contractual language was correctly characterized as a question of law or whether it was instead a question of fact that was properly for the judge to determine.[15] Whether a finding of fact subject to appellate review limited by the clearly erroneous rule, or a conclusion of law freely reviewable by this Court, the district court's holding that the Ritchie lease was within the area of interest owned by the partnership must be affirmed. While the furthest reaches of this contractual language might not be established, at least two propositions are clear: (1) The language is not as restrictive as suggested by the Fuquas the area of interest to which Article 10.06 refers is not limited solely to property already owned by the partnership; and (2) at the very least, the area of interest includes properties contiguous to lands owned by the partnership. No reasonable person would find other than that the term "area of interest owned" includes lands contiguous to property owned by the partnership. Consequently, the Ritchie lease, which is in part contiguous to the Beever Brothers lease, falls within the contractual language of Article 10.06. Therefore, J. B. Fuqua had a duty to offer participation in that property to the limited partners of Atlanta Limited No. 2 before acquiring the property for his individual use.
 
 III. Fiduciary Duty
 
 26
 The district court found that J. B. Fuqua had breached his fiduciary duty by acquiring the Ritchie lease without first offering an interest in it to Palmer and, as a remedy, the court imposed a constructive trust on an undivided one-sixth interest in the lease in favor of Palmer.
 
 
 27
 Partners, as a matter of law, stand in a fiduciary relationship to one another. Thigpen v. Locke, 363 S.W.2d 247, 253 (Tex.1962). As sole general partner of Atlanta Limited No. 2, having exclusive power and authority to control and manage the partnership, J. B. Fuqua owed the limited partners an even greater duty than is normally imposed. Huffington v. Upchurch, 532 S.W.2d 576, 579 (Tex.1976). Partners generally have a duty to render "true and full information of all things affecting the partnership" and to account to the partnership "for any benefit ... derived by (one partner) without the consent of the other partners from any transaction connected with the ... conduct ... of the partnership." Tex.Rev.Civ.Stat.Ann. art. 6132b, §§ 20, 21 (Vernon 1970).[16] In addition to these obligations with respect to general standards of conduct, Article 10.06 of the partnership agreement explicitly defines the duty of the partners with respect to acquiring oil and gas properties for their individual benefit or for others if the lands are within the area of interest owned by the partnership, they must be offered first to the limited partners.
 
 
 28
 It is clear then that the relationship between Palmer and J. B. Fuqua was fiduciary in nature the question remains, however, whether the Ritchie lease fell within the scope of their fiduciary relationship. It is only if the alleged impropriety was "within the scope of the underlying relationship of the parties" that there is a breach of fiduciary duty justifying the imposition of a constructive trust. Rankin v. Naftalis, 557 S.W.2d 940, 944 (Tex.1977). The Fuquas argue that the partnership was originally formed to drill and operate only certain specifically described oil and gas properties, and therefore no fiduciary duty existed with respect to properties not listed in the partnership agreement. This contention ignores both the general language of Article 1.02 and, more importantly, the existence of Article 10.06 that creates a specific fiduciary duty with respect to any property acquired by an individual partner in the area of interest owned by the partnership. Thus, if the Ritchie lease was within the area of interest owned by the partnership, then a fiduciary duty existed with respect to the acquisition of that property. Accordingly, the district court properly granted a directed verdict to the effect that J. B. Fuqua's failure to offer Palmer an opportunity to participate in the acquisition and development of the Ritchie lease prior to Fuqua's acquisition of that property for his individual use was a breach of fiduciary duty. The abuse of a fiduciary relationship that renders the acquisition of property unconscionable gives rise to a constructive trust. Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 261 (1951). Thus, imposition of a constructive trust was the appropriate remedy for J. B. Fuqua's breach of fiduciary duty. See Rankin, 557 S.W.2d at 944.
 
 
 29
 Defendants' reliance on Smith v. Bolin, 261 S.W.2d 352 (Tex.Civ.App. Fort Worth 1953), aff'd in part & rev'd in part, 153 Tex. 486, 271 S.W.2d 93 (1954), is misplaced. The Texas Supreme Court summarized the facts and disposition of Bolin as follows:(I)n Bolin there was a written partnership agreement between the parties, with Bolin named the managing partner. The partnership took leases on certain properties, including several that were known as the Howard leases. When Bolin took new leases of the partnership's Howard leases, this court ruled that there was a fiduciary duty which Bolin owed his partners. This court held further, however, that Bolin owed his partners no fiduciary duty to include them in "farmout" agreements he made with Standard Oil and Reno Oil as to two other leases, because they were not embraced in the written contract. The court of civil appeals had held with respect to those leases which were outside the original contractual agreement: "The fiduciary duties they owed one another would be no broader than the activities encompassed by their agreements relating thereto." Smith v. Bolin, 261 S.W.2d 352, 370 (Tex.Civ.App.1953). This court reversed the judgment which denied a constructive trust as to the mineral properties which were a part of the written contract; it affirmed the denial of a constructive trust as to the properties which were not described in the contract between the parties.
 
 
 30
 Rankin, 557 S.W.2d at 946. Thus, Bolin involved two separate transactions. First, defendant acquired for himself property that had previously belonged to the partnership with respect to that property the Texas Supreme Court held that a fiduciary duty existed. Second, the defendant entered into contracts involving two other leases with respect to that property the court held that no fiduciary duty existed.
 
 
 31
 Defendants claim that Bolin established a "definitive formulation of the requisites of a constructive trust." Brief for Appellants J. B. Fuqua and J. Rex Fuqua at 33. According to that case, defendants allege, in order to impose a constructive trust in situations where a written partnership agreement exists, it must be proved that: (1) the defendant acquired the leases solely on knowledge that was the property of his trust; (2) the knowledge obtained by the defendant during and because of the fiduciary relationship in itself occasioned the defendant to obtain the leases; and (3) the defendant acted in bad faith in acquiring the leases for himself. The constructive trust remedy is not as limited as defendants contend. The plaintiffs in Bolin "alleged that Bolin acquired knowledge from the operations on the Howard land leases, and/or during the period when he was in fiduciary relationship with them, which he used to re-acquire that same property and other nearby properties." 261 S.W.2d at 365-66. Thus, in that case plaintiffs specifically charged defendant with a bad faith use of information properly belonging to the partnership. Here, plaintiff made no such allegations. Contrary to defendants' contentions, Bolin did not create a rule that a constructive trust could only be imposed as a remedy for a breach of fiduciary obligation involving a misuse of information. Although that is one situation that would give rise to the "unfair conduct or unjust enrichment" that is a necessary prerequisite to the imposition of a constructive trust, it is certainly not the only way in which a constructive trust may arise.
 
 
 32
 Defendants further allege that, as with the farmout contracts in Bolin, the Ritchie lease was not within the original contractual agreement and so could not be the basis for a breach of fiduciary duty. It is true that the partnership agreement in Bolin, like that of Atlanta Limited No. 2, contained a broad statement of purpose. The partnership agreement in Bolin stated that the purpose of the partnership was: " 'buying, selling, trading, exchanging, developing, equipping, and producing oil, gas, mining leases, real estate, royalties, and all other minerals and other property and interest therein'." Bolin, 261 S.W.2d at 359. Despite this broad statement of purpose, however, the Texas Supreme Court held that no fiduciary duty existed with respect to the leases involved in the farmout contracts because they were not embraced in the written contract between the parties. There is no evidence, however, that the partnership agreement in Bolin contained a provision analogous to Article 10.06 here. Moreover, the court of civil appeals found that the parties had impliedly limited the scope of their enterprise to the Howard leases only.[17]
 
 
 33
 The instant case is a good deal more similar to Huffington than to Bolin. In Huffington, the partnership agreement stated that the purpose of the partnership was to:
 
 
 34
 acquire, own, develop and operate oil, gas and mineral leases, mineral interests and royalty interests, properties and prospects and to produce therefrom and treat, transport and market oil or gas, or both of them, or production derived therefrom.
 
 
 35
 532 S.W.2d at 578. In addition, the agreement "provided that the partners were 'free to conduct, in their individual capacities, or in association with others, any other business transaction not directly related to the business of acquiring mineral leases and other mineral or royalty interests and the exploration for and production of oil, gas and other minerals.' " Id. Thus, the partnership agreement there, like the agreement governing Atlanta Limited No. 2, specifically designated the types of ventures in which the partners could engage without breaching a fiduciary duty to each other. In that case, where the managing partner acquired for himself an interest in an Indonesian oil and gas project,[18] the Texas Supreme Court approved the imposition of a constructive trust. The Texas Supreme Court later characterized the Huffington case as one "in which the original contract embraced the general business for the continued acquisition of mineral lands." Rankin, 557 S.W.2d at 943. In the instant case, the original contract embraced the acquisition of property within the area of interest owned by the partnership. Thus, the original contract embraced the acquisition of the Ritchie lease.
 
 Defendants rely heavily on cases in which
 
 36
 the contract clearly shows the intention of the parties to it to restrict the scope of the joint enterprise to the ownership and operation of the property described in the contract and no intention to deprive either party of the right to acquire or to operate other property in the field ....
 
 
 37
 Warner v. Winn, 145 Tex. 302, 197 S.W.2d 338, 343 (1946). See Rankin, 557 S.W.2d at 945-46 (joint venture limited to the development of only one lease). The partnership agreement in the instant case reflects a totally dissimilar intent. The broad, general statement of purpose indicates that the parties did not intend to limit their enterprise to the properties specifically listed in the agreement, and Article 10.06 explicitly manifests the parties' intention to limit the general partner's right to acquire or operate other property in the area of interest owned by the partnership. Just like the improper acquisition in Huffington, the venture in the instant case the acquisition of the Ritchie lease fell within the nature of the partnership business as defined by the written contract, particularly Article 10.06. And just as the imposition of a constructive trust was proper there, it is also proper here.
 
 
 38
 IV. Statute of Frauds, Statute of Conveyances, Texas Trust Act
 
 
 39
 Defendants contend that Article 10.06, as interpreted by the district court, is invalid under the Texas Statute of Frauds,[19] Tex. Bus. & Com. Code Ann. tit. 3, § 26.01 (Vernon 1968 & Supp. 1980), and the Statute of Conveyances,[20] Tex.Rev.Civ.Stat.Ann. art. 1288 (Vernon 1980). They claim that Article 10.06 fails the sufficiency of description requirement under both of those statutes since the term "area of interest owned by this Partnership" does not describe the land to be conveyed so that it may be identified with reasonable certainty from the written instrument alone.
 
 
 40
 Although the Statute of Frauds, by its terms, applies to "a contract for the sale of real estate," it has been interpreted to apply not only to actual oil and gas leases, Shaller v. Allen, 278 S.W. 873 (Tex.Civ.App. Amarillo 1925, no writ), but also to assignments of leases, options to acquire leases, Stekoll Petroleum Co. v. Hamilton, 152 Tex. 182, 255 S.W.2d 187 (1953), contracts to assign leases, Gatewood v. Graves, 241 S.W. 264 (Tex.Civ.App. Fort Worth 1922, no writ), and contracts to sell leases, Cantrell v. Garrard, 240 S.W. 533 (Tex.Com.App.1922, judgment adopted). Indeed, the Statute of Frauds generally applies when "the performance promised requires an act that will transfer property in land." 2 A. Corbin § 398, at 361. Article 10.06 is not, however, a contract for the sale of real estate, an option contract for the sale of real estate,[21] or a contract to assign real estate. It is simply a statement of fiduciary obligation in a partnership agreement. The purpose of the partnership is stated in Article 1.02 in a general manner: to acquire, explore, and develop oil and gas properties in areas selected by the general partner. Article 10.06 specifies when a partner can acquire property for his individual interest without improperly competing with partnership interests, thereby violating his fiduciary responsibilities to his co-partners. He can acquire such property without restriction if it is not within the area of interest owned by the partnership. If it is within the area of interest owned by the partnership, then he can acquire it only after offering an interest in it to the limited partners. Thus, Article 10.06 requires a partner to make an offer under certain circumstances it is not the offer itself. Consequently, it does not appear that Article 10.06 is the type of contractual undertaking that would be invalidated by the Statute of Conveyances or the Statute of Frauds.
 
 
 41
 Moreover, it is not altogether clear that under Texas law the Statute of Frauds would even apply to Article 10.06. "One large class of cases in which the statute is held not to apply consists of contracts of partnership or of joint adventure, the subject matter of which is land." 2 A. Corbin § 399, at 367. "A contract between two persons to go into the business of buying and selling real estate as partners or as joint adventurers, sharing the profits and losses thereof, is not within section 4 (of the Statute of Frauds) unless there is a provision for the transfer of specific land from one party to the other." Id. § 411, at 418-19 (footnote omitted). See Palmetto Lumber Co. v. Gibbs, 52 S.W.2d 120, 128 (Tex.Civ.App. Beaumont 1932), aff'd, 124 Tex. 615, 80 S.W.2d 742 (1935). See also Berne v. Keith, 361 S.W.2d 592, 597 (Tex.Civ.App. Houston 1962, writ ref'd n.r.e.). Since this partnership agreement does not require the transfer of land from one partner to another, and since Article 10.06 is neither a contract for the sale of property nor an option contract for the sale of property, it would seem that the Statute of Frauds does not apply to invalidate it and that Article 10.06 is not unenforceable because it fails to satisfy the Statute of Frauds.
 
 
 42
 Actually, however, whether Article 10.06 is an enforceable provision is not relevant to the inquiry at hand. This is not an action to enforce Article 10.06 of the partnership agreement. Nor is this an action for specific performance of a contract provision. This is, instead, simply an action to impress a constructive trust upon property as a remedy for the breach of a fiduciary obligation.[22] The imposition of a constructive trust is not prevented by the Statute of Frauds, the Statute of Conveyances, or the Texas Trust Act. Ginther v. Taub, 570 S.W.2d 516, 525 (Tex.Civ.App. Waco 1978, writ ref'd n.r.e.).
 
 
 43
 The imposition of a constructive trust is appropriate when there is a breach of a fiduciary duty that results in unjust enrichment. As discussed above, Texas jurisprudence has made it clear that, with some exceptions not applicable here, unless the property at issue is within the scope of an underlying fiduciary relationship, no constructive trust will be imposed. Thus, the Texas courts have strictly construed the existence and scope of the confidential relationship necessary to the imposition of a constructive trust. See Tyra v. Woodson, 495 S.W.2d 211, 213 (Tex.1973) (" '(F)or a constructive trust to arise there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit.' ") (quoting Consolidated Gas & Equipment Co. v. Thompson, 405 S.W.2d 333, 336 (Tex.1966)). To do otherwise would undermine the Statute of Frauds, which is aimed at preventing land titles from resting in parol. Defendants here claim that imposing a constructive trust on a fraction of the Ritchie lease allows Palmer's title to rest in parol; that Palmer's title then arises from the interpretation of the language "area of interest owned by this Partnership" as encompassing the Ritchie lease; and that Palmer's title is not based upon any writing that describes the property to be conveyed in a manner sufficient to satisfy the Statute of Frauds. This argument ignores the wellestablished proposition that constructive trusts do not fall within the Statute of Frauds and may be imposed where there is "strict proof of a prior confidential relationship and unfair conduct or unjust enrichment on the part of the wrongdoer." Rankin, 557 S.W.2d at 944. Defendants' argument unjustifiably attempts to extend the position that has been taken by the Texas Supreme Court. Defendants have tried to convince this Court that the existence and scope of the requisite confidential relationship must be evidenced by a writing sufficient to satisfy the requirements of the Statute of Frauds. This is too demanding a requirement and is not necessary under Texas law.
 
 
 44
 Constructive trusts are not within the Statute of Frauds and are also not prohibited by the Texas Trust Act. Prior to 1943, the law of Texas was that trusts of any kind could be established by parol. Fitz-Gerald, 237 S.W.2d at 260. This rule "was not a special exception to subdivision 4 of the statute (of frauds) but simply something with which the subdivision is not concerned." Id. at 266 (Garwood, J., concurring). In 1943 the Texas Trust Act was enacted. That legislation provided that a "trust in relation to or consisting of real property" was invalid unless evidenced by a writing. Tex.Rev.Civ.Stat.Ann. art. 7425b-7 (Vernon 1960).[23] In 1945 the Texas Legislature defined a trust in such a way as to make clear that constructive trusts were excluded from the Texas Trust Act. Tex.Rev.Civ.Stat.Ann. art. 7425b-2 (Vernon 1960).
 
 
 45
 Although the remedy of a constructive trust must be used with caution to avoid undermining the policy of the Statute of Frauds, the Statute of Conveyances, and the Texas Trust Act, the requisite fiduciary duty and unfair conduct need not be established by evidence sufficient to satisfy the Statute of Frauds. As long as a fiduciary relationship which encompasses the property at issue is established, a constructive trust may be imposed irrespective of a failure to meet the requirements of the Statute of Frauds. Here, the district court properly rejected the defendants' defenses of the Statute of Frauds, Statute of Conveyances, and Texas Trust Act.
 
 V. Defendants' Proposed Defenses
 
 46
 The district court correctly refused to instruct the jury on defendants' proposed defenses of abandonment, waiver, laches, and estoppel.[24] To establish abandonment or waiver, "there must be proof of an intent to relinquish a known right." Huffington, 532 S.W.2d at 579-80. To prove the defense of estoppel by silence, it must be shown that the party who failed to speak to protect his rights had a duty to speak. Here, the evidence does not show that Palmer knew that J. B. Fuqua had acquired the Ritchie lease for his individual interest. He could not, therefore, have abandoned or waived his right to participate in that property when he reasonably thought it had already been acquired for the benefit of the partnership. Furthermore, he had no duty to assert an interest in the property Article 10.06 expressly imposes a duty on the partner acquiring property in the area of interest owned by the partnership to offer participation to the limited partners. No duty is imposed upon the limited partners. As there was not sufficient evidence in the record for a reasonable jury to have found in favor of defendants on any of these defensive issues, it was not improper for the trial court to direct a verdict against defendants on these issues.
 
 
 47
 Finally, there is no merit in defendants' argument that exemplary damages were improperly awarded. It appears to be well settled that under Texas law, exemplary damages will not be awarded for a mere breach of contract. The instant suit, however, is not an action for a mere breach of contract; this is an action for the breach of a fiduciary duty owed to a limited partner by the managing, general partner. Under Texas law exemplary damages are appropriate where there is a showing of malice. Grey v. First National Bank, 393 F.2d 371, 382 n.12 (5th Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). See Dennis v. Dial Finance & Thrift Co., 401 S.W.2d 803, 805 (Tex.1966) ("A person who intentionally misrepresents facts for the purpose of injuring another is guilty of wanton and malicious conduct."). Fraud, including legal fraud, or wilful misconduct are appropriate bases for the award of exemplary damages. Morgan v. Arnold, 441 S.W.2d 897, 905 (Tex.Civ.App. Dallas 1969, writ ref'd n.r.e.); Tennessee Gas Transmission Co. v. Moorhead, 405 S.W.2d 81, 86 (Tex.Civ.App. Beaumont 1966, writ ref'd n.r.e.). See Goggin v. Moss, 221 F.Supp. 905, 920 (N.D.Tex.1962) ("In view of the fraudulent and flagrant misconduct of the defendant ..., he is liable to the plaintiffs in exemplary damages ...."), aff'd sub nom. Johnston v. Goggin, 323 F.2d 36 (5th Cir. 1963). See also Dennis v. Dial Finance & Thrift Co., 401 S.W.2d at 805 ("(E)xemplary damages may properly be awarded when the plaintiff has suffered actual fraud intentionally committed for the purpose of injuring him."). As stated in Morgan:
 
 
 48
 It must be borne in mind that we are not here dealing with an arm's length transaction between strangers but, on the contrary, we are confronted with the relationship between partners who had fiduciary relationship with each other. Our Supreme Court in Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720 (1938), said that partners have a fiduciary relationship and that when persons enter into a partnership, "each consents, as a matter of law, to have his conduct towards the other measured by the standards of the finer loyalties exacted by courts of equity." It has been held that failure to inform a co-owner of material facts breaches the fiduciary duty between partners and that such omission results in a "legal fraud." Perpetual Royalty Syndicate v. Albritton, 149 S.W.2d 700 (Tex.Civ.App., Fort Worth 1941, writ dism'd, correct jdgmt.).
 
 
 49
 441 S.W.2d at 905.
 
 
 50
 The district court's charge to the jury properly required the jury to find that J. B. Fuqua had engaged in intentional and wilful misconduct before awarding exemplary damages. There is substantial evidence in the record to support the jury verdict; consequently, the award of exemplary damages was proper.
 
 
 51
 Since there was no reversible error at trial, the district court judgment is
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 Hytech Energy Corporation was joined as a defendant to this action when it was discovered that Hytech currently owns the record title to the Ritchie lease. On October 15, 1977, both J. B. and J. Rex Fuqua assigned their interests in the Ritchie lease to Hytech, and Hytech is presently operating those leases
 The controlling stock interest in Hytech Energy Corporation is owned by Hytech Resources Corporation. One hundred percent of the stock of Hytech Resources Corporation is presently, and has been during all times relevant to this controversy, owned by J. B. Fuqua. At the time of trial, J. B. Fuqua was Chairman of the Board of Directors of both corporations. J. Rex Fuqua, J. B.'s son, has served as Secretary of Hytech Energy Corporation and as President of Hytech Resources Corporation. At the time of trial, he was Secretary of Hytech Resources Corporation.
 
 
 [2]
 One of the prior ventures was a Texas limited partnership known as Atlanta Limited, sometimes referred to as Atlanta Limited No. 1. The other was an oil and gas drilling venture in the State of California called Lokern Limited
 
 
 [3]
 On direct examination at trial, Palmer testified that Beck's assertions that the Fuquas would be involved in the venture contributed to his decision to participate. Record, vol. 5, at 48. On cross-examination, Palmer testified as follows:
 Q. As a matter of fact, you were attracted to the partnership solely by Mr. Beck?
 A. That's right.
 Q. Any representations concerning that partnership or what it might hold in store for you was through Mr. Charles Beck?
 A. Well, I was influenced, though, by the affiliation of the other parties. In other words, you use judgment as to their good judgment because they were knowledgeable in the oil business and I if it hadn't been for that, I would not have gone with him. Now, there was I have depended on their good judgment rather than mine because I didn't have any.
 Q. I see. Now, if I understand you, you obviously had overt representations of any type from Mr. Beck but when Mr. Beck told you that the Fuquas were involved, that was influential to you?
 A. Yes. It was.
 Record, vol. 5, at 235.
 Q. (Y)ou had never met the Fuquas and yet you were influenced by their being participants in Atlanta Number 2 but you you don't base that influential factor on their reputation?
 A. That's true. Mr. Beck gave me a good selling job on their ability in the oil industry and their success investing with him in the past and I, not knowing much about the industry, especially directly like that, I just went ahead and invested with him. I took a chance on it.
 Record, vol. 5, at 236-37.
 
 
 [4]
 This addendum is also dated April 22, 1976
 
 
 [5]
 The Beever Brothers lease, which is dated April 27, 1971, covers 217.83 acres of land in Frio and LaSalle Counties
 
 
 [6]
 LaVaca and Colorado Counties were also listed in Schedule 1, although no specific leases in those counties were identified
 
 
 [7]
 The addendum provided that Palmer's participation in the development of and the production arising from the leases would be "in accordance with the terms more specifically to be set forth in" an Agreement of Limited Partnership to be "in substantially the form of the 20-page limited partnership agreement heretofore provided to Palmer by Charles S. Beck." The Agreement of Limited Partnership of Atlanta Limited No. 2, which is also dated April 22, 1976, is signed by Beck, Palmer, J. B. Fuqua, and J. Rex Fuqua
 
 
 [8]
 One of the exhibits plaintiff produced at trial indicated that the package consisted of the (1) Ritchie lease (480 acres), (2) Sheppard lease (140 acres), (3) Martinez lease (160 acres), (4) McDaniel lease (90 acres), and (5) Miller lease (80 acres). (PX-9)
 
 
 [9]
 At trial Palmer testified as follows:
 Q. When did you first hear of the Ritchie Lease?
 A. The first I heard of it was when Mr. Beck called me that there was some very desirable properties that they wanted to acquire and perhaps the partnership and said he needed $135,000 for it.
 Q. And then why was he calling you?
 A. He said he couldn't reach J. B. Fuqua, that this thing had come up and there was some people coming in from Midland, Texas the next day, I think it was, to buy them if he didn't buy them and could I raise the money for it. And I told him, why, I would have to check with the bank and see what I can do on it and I would call him back the next morning, which I did.
 Record, vol. 5, at 86-87. Palmer further testified that when he called back the following day, he spoke with Lance Beck, Charles Beck's son. Palmer told Lance that he (Palmer) had been able to raise $135,000. Palmer's testimony at trial continued as follows:
 A. And he (Lance) said, "Well, if you will transfer it to the to the bank," he gave me the name of the bank, National Bank of of San Antonio or something like that.... I told him that that I I would rather, since we don't know yet how it's going to be handled, I would rather, if it had to be, either I would send the money down in behalf of the partnership but until an arrangement was made to where, who was going to participate or what credit I would get, I would prefer to send it right direct to Mr. Branham, I think his name was, Branham, the man that was had the leases for sale.
 Q. Now, Lance had suggested you just send it to the credit of Capitol Resources in the bank? Is that correct?
 A. That's right.
 Q. But you were a little bit leery about doing that?
 A. Yes.
 Q. And you suggested that you would send the money but by check payable to the guy from whom they were buying the leases?
 A. That's right.
 Q. Now, and what did Lance say about that?
 A. He said, well, "I I think that probably I can arrange to give them a a deposit and hold it for us until Dad gets back." In other words, see, he didn't want me to make the check out to the to the party that had the leases. I just wanted to be sure that the money was going to the right place.
 Q. Right. Now, when you had talked to Mr. Beck on the preceding day or earlier that day, whichever it was, was there any discussion about whether the leases were going to be acquired for the partnership or for yourself or who was going to be buying the leases?
 A. No question about it being acquired for the partnership.
 Record, vol. 5, at 88-89.
 
 
 [10]
 A subsequent meeting in Atlanta, Georgia between Palmer, the Fuquas, and several others, held November 16, 1976, was also recorded by Palmer. That tape was introduced at trial as well
 
 
 [11]
 Three of the four approximately 80 acre tracts are located less than two miles from the Beever Brothers lease. Tract One is located in LaSalle County, approximately a mile and a half northwest of the Beever Brothers lease. Tract Two is in Frio County and is located approximately two-thirds of a mile southwest of the Beever Brothers lease. Tract Three is located partly in LaSalle and partly in Frio County and is contiguous to the westerly boundary of the Beever Brothers lease. Tract Four is located in Frio County and is approximately five miles in a southerly direction from the Beever Brothers lease. Mr. Jack Byrd, Executive Vice President of Operations for Hytech Energy Corporation, testified on deposition that Tract Four was not of the quality of the other three tracts, but that it had to be taken in order to acquire the three high-quality tracts to the north. Both the Beever Brothers lease and the Ritchie lease are within the South Covey Chapel Area
 
 
 [12]
 One well was located on Tract One (Ritchie # 1), one on Tract Two (Ritchie # A2), and one on Tract Three (Ritchie # A1). No well was drilled on Tract Four of the lease, and the lease has now terminated as to that tract. The three wells were all completed as commercial producers of oil from the Austin Chalk Formation. The # A1 well was drilled as an offset to the Beever Brothers lease and is located 750 feet from its westerly boundary line. The acquisition and development costs of the Ritchie lease amounted to $931,215.42
 At trial, Mr. Jack Byrd testified as follows with respect to the desirability of offsetting an existing commercial producer:
 Q. And I presume the Ritchie 1 was drilled where it was in order to get as close as you could put it to those offsetting good producers?
 A. That's correct.
 Q. You can't ever tell for sure in the chalk formation, I gather from your testimony, that you are going to get a producer?
 A. A commercial producer.
 Q. Commercial producer, but the closer you get to a good producer, the better your chances are?
 A. Well, I would say that's the case. You might step out there where there's not any wells and find another good "sweet spot" but that would be a little more risky than drilling up to an existing well.
 Q. That's the reason, because if you have got a good producer, it's highly fractured and if you get close to it, you might be in a similarly fractured zone?
 A. That's correct.
 Record, vol. 6, at 899-900.
 
 
 [13]
 Defendants attempted to raise this issue in several different ways. On April 19, 1978, defendants filed a motion for the appointment of a receiver for a one-sixth interest in the assets of Atlanta Limited No. 2. This motion arose from J. B. Fuqua's resignation as general partner of Atlanta Limited No. 2, which terminated the partnership in accordance with Article 14.01(a) of the partnership agreement. J. B. Fuqua alleged that he had undertaken the winding up of the affairs of the partnership and the distribution of its assets pursuant to Article 14.03. Defendants' counterclaim, the Fuquas contended, placed Palmer's ownership of an interest in the partnership properties or assets in question, thereby requiring the appointment of a receiver to take possession of the disputed property. On June 16, 1978, the district court denied defendants' motion for the appointment of a receiver since there appeared to be no present actual danger of the property being lost, removed, or materially injured
 Defendants raised this issue once again on July 12, 1978, by a petition for a bill of interpleader. J. B. Fuqua sought the bill of interpleader so that he could wind up and terminate the partnership and allow the court to take care, custody, and control of the contested one-sixth interest of the partnership assets. On August 25, 1978, the district court ordered that the petition be stricken as improvidently filed. The court ruled that the relief requested was actually in the nature of a counterclaim, and that defendants would have to request leave from the court to file an amended answer in order to raise this counterclaim. Defendants made such a motion on January 10, 1979, and the motion was granted by the court on January 25, 1979.
 
 
 [14]
 Interestingly, although the parties agree that the phrase is unambiguous, they each suggest different interpretations of the language. Palmer contends that the phrase does not describe a specific geological area; rather, whether any given property is within the area of interest owned by the partnership depends upon whether the partnership, by reason of its past or current operations, its ownership, or its expressed intentions, might reasonably be expected to be interested in the area. Defendants, on the other hand, contend that this language applies only to the acquisition by a partner of outstanding interests in leases presently owned by the partnership. Happily, however, " '(c)ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction.' " Freeman v. Continental Gin Co., 381 F.2d 459, 465 (5th Cir. 1967) (quoting Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248, 250-51 (7th Cir. 1948), cert. denied, 337 U.S. 915, 69 S.Ct. 1155, 93 L.Ed. 1725 (1949))
 
 
 [15]
 It is clear that the interpretation of the legal effect of a contract is a question of law for the court to decide. Thornton v. Bean Contracting Co., 592 F.2d 1287, 1290 (5th Cir. 1979); Makofsky v. Cunningham, 576 F.2d 1223, 1229 n.7 (5th Cir. 1978); West v. Harris, 573 F.2d 873, 877 (5th Cir. 1978), cert. denied, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979). The question whether the Ritchie lease falls within the phrase "area of interest owned by this Partnership," however, might more accurately be characterized as a question of fact. "The question of interpretation of language and conduct the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law." 3 A. Corbin, Corbin on Contracts § 554, at 219 (1960). See Valley Cement Indus., Inc. v. Midco Equip. Co., 570 F.2d 1241, 1243 (5th Cir. 1978) ("The interpretation of a contract is a question of fact."). Yet even when dealing with the interpretation of the meaning of a contract, "if the evidence is so clear that no reasonable man would determine the issue before the court in any way but one," the issue is one that is properly for the judge to determine. 3 A. Corbin § 554, at 222. Thus, the meaning of a contract, when the contract is not ambiguous, is oftentimes characterized as a question of law. Battig v. Hartford Accident & Indem. Co., 608 F.2d 119, 120 (5th Cir. 1979) ("Absent latent or patent ambiguities, the meaning of a contract is for the court as a matter of law."). Consequently, whether this is a question of law or one of fact, the issue was properly before the trial court judge to decide. The result is the same under Texas law. Lee v. Hunt, 631 F.2d 1171, 1180 (5th Cir. 1980) ("Under Texas law, the interpretation of an unambiguous contract as well as the determination of whether or not a contract is ambiguous is a legal question."). See Ammons v. Franklin Life Ins. Co., 348 F.2d 414, 416 (5th Cir. 1965) ("If there should be any difference between the state and the federal rule, it must be remembered that in the federal courts the right to a jury trial is to be determined as a matter of federal law in diversity as well as other actions.")
 
 
 [16]
 The provisions of the Texas Uniform Partnership Act are applicable to limited partnerships. Tex.Rev.Civ.Stat.Ann. art. 6132b, § 6(2) (Vernon 1970); Horn v. Builders Supply Co., 401 S.W.2d 143, 148 (Tex.Civ.App. Tyler 1966, writ ref'd n.r.e.)
 
 
 [17]
 The court of civil appeals in Bolin stated that:
 The venture engaged in by the members of the second group was specific as to the property upon which they conducted same, being upon their jointly held leasehold estates in the Howard lands. All parties knew and understood that D. H. Bolin engaged in transactions of like character with other parties and also as an individual at other places. He was in the oil business generally and dealt in leases and in operations on leases in many places. Likewise, at least certain other members of the second group engaged in oil activities outside those the second group engaged in together. Even though they were in fiduciary relationship, one to another, as to the Howard land leases during the period they owned them, these leases were the corpus of their trust and impliedly though not expressly the scope of their enterprise was narrowed to such or to operations thereon. It was the only premises on and in relation to which all of them or any of them could have acted in respect to privilege or duty pursuant to the purposes of their association. The rules of equity applicable to them in relation to such premises and to ventures there prosecuted will not be extended so as to forbid the acquisition, ownership or development by one of the parties for his own benefit of property not embraced in the enterprise and outside its scope.
 
 
 [261]
 S.W.2d at 369-70. In the instant case, although the parties might have been aware that J. B. Fuqua engaged in similar transactions with other people, Article 10.06 was specifically incorporated into the partnership agreement in order to prevent any conflict between the partnership and the parties' individual dealings. The parties apparently made no such provisions in Bolin
 
 
 [18]
 Huffington, the managing partner, acquired an interest in the Indonesian project for Huffington, Inc., a corporation of which he was the sole owner. Huffington refused to allow his co-partners in Huffington Associates to participate in the venture
 
 
 [19]
 The Statute of Frauds provides, in pertinent part:
 (a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is
 (1) in writing; and
 (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.
 (b) Subsection (a) of this section applies to:
 (4) a contract for the sale of real estate ....
 
 
 [20]
 Article 1288 provides:
 No estate of inheritance or freehold, or for a term of more than one year, in lands and tenements, shall be conveyed from one to another, unless the conveyance be declared by an instrument in writing, subscribed and delivered by the party disposing of the same, or by his agent thereunto authorized by writing.
 
 
 [21]
 Defendants contend that "Article 10.06 is unenforceable as a contractual option because it fails to state the price at which the property is to be offered; or how much property is to be offered the limited partners; and, most importantly, it fails to supply an adequate description of the property to be conveyed.... In short, Article 10.06 fails to supply virtually all of the terms essential to the enforcement of a contract." Brief for Appellants J. B. Fuqua and J. Rex Fuqua at 21-22. An option contract is a contract that creates in the optionee the power to accept an offer for a limited period of time. Article 10.06 does not fulfill this function. Rather, it designates more specifically the fiduciary duties of the partners with respect to each other
 
 
 [22]
 It is also for this reason that defendants' argument that Article 10.06 is unenforceable as a conditional promise to enter into a future contract must fail. Defendants argue that Article 10.06 cannot be enforced as a promise to enter into a contract in the future, because it fails to specify the essential terms of the agreement. See Eberling v. Fair, 546 S.W.2d 329, 334 (Tex.Civ.App. Dallas 1976, writ ref'd n.r.e.) ("It is well settled that courts cannot make contracts for the parties and that an agreement to enter into negotiations in the future cannot be enforced because the court has no means to determine what sort of contract the negotiations would have produced."). Since this is an action based upon a breach of fiduciary duty, and not an action to enforce a promise to enter into a contract, defendants' reliance on Eberling is misplaced
 
 
 [23]
 This was apparently intended to apply only to express trusts. See Fitz-Gerald, 237 S.W.2d at 260-61
 
 
 [24]
 On appeal, the Fuquas also rely upon the defense of acquiescence. At trial, however, the Fuquas did not plead, prove, or request an instruction on the defense of acquiescence. They are not entitled to raise this defense for the first time on appeal